JUDICIAL WATCH, INC., Plaintiff,

v.

UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.

Natural Resources Defense Council, Inc., Plaintiff,

v.

United States Department of Energy, Defendant.

Natural Resources Defense Council, Inc., Plaintiff,

v.

Department of Interior, et al., Defendants.

No. CIV.A. 01–0981(PLF), CIV.A. 01–2545(PLF), CIV.A. 02–1330(PLF).

United States District Court, District of Columbia.

March 31, 2004.

Larry Elliot Klayman, James F. Peterson, Judicial Watch, Incorporated, Paul J. Orfanedes, Klayman & Associates, PC, Eric Robert Glitzenstein, Howard Mesnikoff Crystal, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Sharon Buccino, Senior Atty., Natural Resources Defense Council, Washington, DC, for plaintiff National Resources Defense Council.

Daniel Edward Bensing, Elizabeth J. Shapiro, Gillian Flory, U.S. Department of Justice, Washington, DC, for Defendants.

### OPINION

PAUL L. FRIEDMAN, District Judge.

Plaintiffs have filed the above-captioned cases to challenge the responses of the defendant departments and agencies to plaintiffs' requests for records under the Freedom of Information Act, 5 U.S.C.

§ 552 *et seq.* Plaintiff Natural Resources Defense Council has filed motions for summary judgment with respect to the Department of Energy, the Department of the Interior and the Bureau of Land Management. All of the defendants have filed motions for summary judgment. The consolidated cases came before the Court for a motions hearing on January 26, 2004. For the reasons stated below, the Court grants in part and denies in part plaintiff Natural Resources Defense Council's motions for summary judgment and the motions for summary judgment of defendants Department of Energy, Department of the Interior, Bureau of Land Management, Department of Agriculture, Environmental Protection Agency, Department of Commerce, and Department of Transportation. The Court denies the motions for summary judgment of defendants Department of the Treasury and Federal Emergency Management Agency. Defendant Office of Management and Budget has settled with plaintiff Judicial Watch and its motion for summary judgment therefore is denied as moot.

## I. BACKGROUND

On January 29, 2001, President George W. Bush issued a Presidential Memorandum creating, within the Executive Office of the President, the National Energy Policy Development Group ("NEPDG"). *See* Motion for Summary Judgment by Defendants Environmental Protection Agency and Department of Energy ("EPA and DOE Mot.") at 3. The stated purpose of the NEPDG was to gather information and provide the President with recommendations for a national energy policy. *See id.* at 3. The NEPDG consisted of: the Vice President, the Secretary of the Treasury, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Transportation, the Secretary of Energy, the Director of the Federal Emergency Management Agency, the Assistant to the President and Deputy Chief of Staff for Policy, the Assistant to the President for Economic Policy, and the Assistant to the President for Intergovernmental Affairs. *See id.* at 3. The Vice President chaired the NEPDG and was authorized to invite the Chairman of FERC, the Secretary of State, and "other officers of the federal government" to participate, as appropriate. *Id.* at 3–4.

Representatives from each member agency participated in an NEPDG working group ("Working Group") to assist the NEPDG in formulating its recommendations to the President. *See* EPA and DOE Mot. at 4. The Working Group, composed of federal employees assigned from their respective agencies and departments to the NEPDG, was responsible for the NEPDG's daily operations. *See id.* The Working Group also was responsible for developing a draft outline for the energy policy report and for delegating tasks to the participating agencies with expertise in particular areas. *See id.*

Ultimately, the work-product of the nine departments and agencies involved was conveyed to the Working Group and on to the NEPDG, the Vice President and the President. *See* EPA and DOE Mot. at 8. On May 17, 2001, the NEPDG publicly issued the final version of the energy policy report ("Report"). *See id.*

### A. Judicial Watch

On April 19, 2001, plaintiff Judicial Watch sent FOIA requests to the Department of Agriculture ("USDA"), the Department of Commerce ("DOC"), the Department of Energy ("DOE"), the Department of the Interior ("DOI"), the Department of the Treasury ("Treasury"), the Environmental Protection Agency ("EPA"), the Federal Emergency Management Agency ("FEMA") and the Of-

fice of Management and Budget ("OMB"). Judicial Watch's FOIA requests sought documents regarding:

1. [The] Bush Administration energy task force (the Energy Policy Development Group) and its deliberations.

2. Communications to and from the Bush Administration energy task force.

3. Communications between members of the task force and its administrators, Andrew Lundquist and Karen Knutson.

Judicial Watch Supplemental Amended Complaint ("J.W. Compl."), Ex. 1 at 1–2.

On May 9, 2001, Judicial Watch filed the instant action against all the departments and agencies to which it had submitted FOIA requests to compel compliance with the requirements of the FOIA. After the suit was filed, Treasury and FEMA denied plaintiff's request for a fee waiver. Treasury and FEMA stopped processing plaintiff's FOIA requests when plaintiff did not agree to pay the required fee. *See Judicial Watch, Inc. v. United States Department of Energy*, 191 F.Supp.2d 138, 140–141 (D.D.C.2002). As of March 5, 2002, OMB, DOI, USDA and EPA had responded to the FOIA request of Judicial Watch, but DOE, DOT and DOC were still processing the requests and had produced no documents. *See id.* at 140. On March 5, 2002, the Court ordered OMB, DOI and USDA to produce any additional non-exempt records and a *Vaughn* index to plaintiff. DOE, EPA, DOC and DOT were ordered to provide Judicial Watch with a package of non-exempt records and parts of records and a *Vaughn* index. *See id.* at 141. The defendants then briefed the instant motions for summary judgment.

### B. Natural Resources Defense Council

On April 26, 2001, plaintiff Natural Resources Defense Council submitted FOIA requests to DOI and DOE requesting records relating to the NEPDG. *See* NRDC's Complaint against the Depart-

ment of the Interior and the Bureau of Land Management ("NRDC DOI Compl.") at ¶ 23; NRDC's Complaint against the Department of Energy ("NRDC DOE Compl.") at ¶ 14. NRDC requested the following records under the FOIA:

1. Records identifying the members of the Task Force and any and all working groups, subcommittees or other groups reporting to the Task Force;

2. Records relating to the purpose or work plan of the Task Force and any and all working groups, subcommittees or other groups formed to assist the Task Force;

3. The calendars dating from January 21, 2001 to the present of the agency head and any agency staff performing work related to the Task Force;

4. Minutes, notes or other records of meetings attended by the agency head or any agency staff relating to the work of the Task Force;

5. Records relating to any contractors or temporary full-time agency employees hired by the agency regarding the work of the Task Force, including but not limited to the contracts with these individuals, their resumes, and their SF–171 forms;

6. Records relating to communications between agency personnel and members of the Presidential transition team (a list of the individual names is attached) regarding the Task Force;

7. Records regarding any efforts by agency personnel or the Task Force to screen for conflicts of interest or bias among the individuals or groups providing advice relating to the work of the Task Force;

8. Records prepared by agency personnel relating to the work of the Task Force;

9. Records received from non-agency individuals or groups, contractors or temporary full-time agency employees relating to the work of the Task Force; and

10. Records relating to solicitation of advice from individuals or groups regarding the work of the Task Force that have not already been included in response to any of the categories above.

NRDC DOI Compl. at ¶ 23; NRDC DOE Compl. at ¶ 14.[1]

NRDC filed a subsequent FOIA request with DOI on April 18, 2002. *See* NRDC DOI Compl. at ¶ 29. By this submission NRDC requested:

1. The complete calendars for Secretary Norton, Sue Ellen Wooldridge, Tom Fulton, Ann Klee, William Bettenberg and Brian Waidmann;

2. Any and all correspondence to and from Secretary Norton and other agency staff with outside parties relating to matters considered by the Task Force;

3. Any and all correspondence to and from agency staff and other government employees relating to matters considered by the Task Force;

4. Any and all minutes, notes or other records of meetings attended by agency staff relating to the work of the Task Force;

5. Financial disclosure forms to the extent they are not protected from public disclosure for Secretary Norton, Sue Ellen Wooldridge, Tom Fulton, Ann Klee, William Bettenberg and Brian Waidmann; and

6. Documents identified above that were listed in the *Vaughn* index provided to Judicial Watch as being partially

released, but which NRDC did not receive.

NRDC DOI Compl., Ex. 2.

NRDC submitted a FOIA request to the Bureau of Land Management ("BLM") on February 14, 2002, asking for records relating to an interagency Task Force on Energy Project Streamlining ("Streamlining Task Force") which had been established by executive order on May 18, 2001 and was intended to expedite energy-related projects. *See* NRDC DOI Compl. at ¶ 33. It requested:

[A]ll records in the possession of the Bureau of Land Management (BLM) or any of its field offices that relate to any project that was the subject of letter(s) or comments(s) submitted to the White House Task Force on Energy Project Streamlining, including but not limited to:

a. [Records] from the Council on Environmental Quality or any member of its staff including the Chairman to any Interior Department official;

b. [Records] from any Interior Department official to any BLM official of employee;

c. [Records] instructing any BLM official or employee in any office including headquarters and field offices to:

 i. Assess whether a project should be streamlined and if so, in what way(s)

 ii. Streamline, expedite or otherwise advance a project; and

 iii. Reject a request for streamlining

d. [Records] from any BLM official or employee to any field office; and

---

1. The "Task Force" was defined by NRDC as the Energy Task Force chaired by Vice President Cheney, in other words, the NEPDG.

e. [Records] from any BLM employee or official to the sponsor(s) of any project referenced above.

NRDC DOI Compl., Ex. 3.

On May 6, 2002, NRDC submitted its final FOIA request to DOI requesting records related to the implementation of the NEPDG recommendations contained in the files of seventeen specified individuals. *See* NRDC DOI Compl. at ¶ 39. It requested:

1. [A]ll records of [seventeen named individuals] that relate to any project that was the subject of letter(s) or comments(s) submitted to the White House Task Force on Energy Project Streamlining ("White House Streamlining Task Force"), including but not limited to:

a. [Records] from the Council on Environmental Quality or any member of its staff ... regarding any project(s) suggested for streamlining;

b. [Correspondence] from or to third parties regarding any project that was the subject of letter(s) or comments(s) submitted to the White House Streamlining Task Force, including letters from sponsors of such projects;

c. [Records] from Interior Department officials to any bureau or agency official or employee regarding any project(s) recommended for streamlining whether by the White House Streamlining Task Force or any other source....;

d. [Records] instructing any agency official or employee in an office including headquarters and field offices to:

i. [A]ssess whether a nominated project should be streamlined and, if so, in what way(s)

ii. [S]treamline, expedite or otherwise advance a nominated project; and

iii. [R]eject a request for streamlining

2. [A]ll records of [the seventeen named individuals] to any agency official or employee relating to implementation of the National Energy Plan and its direction to expedite energy production from public lands and remove or modify obstacles and "impediments" to development, including but not limited to:

a. [Correspondence] to any agency employee or official instructing, informing and/or asking them to take any action in conformance with or furtherance of the above-reference Plan or its directives;

b. [Correspondence] to or from third parties who have recommended or are recommending to the Interior Department, its agencies or bureaus that any energy project (other than those projects that were the subject of letters or comments submitted to the White House Streamlining Task Force) should be expedited, highlight, fast-tracked or pursued;

c. [Correspondence] to any agency or bureau employee or official ... regarding streamlining, expediting or fast-tracking any land use plan for reasons related to development of energy resources, including any directions, criteria or instructions for identifying "time-sensitive" land use plans;

d. [Correspondence] to any agency or bureau employee or official regarding the streamlining of regulations or regulatory procedures adopted or relied on to implement the requirements of the National Environmental Policy Act and any other laws such as the Federal Land Policy and Management Act applicable to energy projects on or production from public lands;

e. [Correspondence] to any agency or bureau employee or official ... directing, instructing or advising the agen-

cy to develop a plan for implementing the National Energy Plan; and

f. [Correspondence] to any agency or bureau employee or official . . . approving the agency's plan for implementing the National Energy Plan;

3. [T]he personnel records for [ten named individuals] showing the date on which they first were employed at DOI during this Administration in any capacity;

4. [F]inancial disclosure forms to the extent they are not protected from public disclosure for [the ten named individuals];

5. [T]he calendars of [sixteen named individuals].

NRDC DOI Compl., Ex. 4.

On December 11, 2001, NRDC filed Civil Action No. 01–2545 against DOE to compel compliance with the FOIA. On February 21, 2002, Judge Gladys Kessler ordered that a package of non-exempt documents and a *Vaughn* index be provided to plaintiff. On March 15, 2002, NRDC's case was consolidated with Judicial Watch's case (Civil Action No. 01–981, the earlier filed case) before the undersigned. *See* LCvR 40.5(d). The parties then briefed cross-motions for summary judgment. On July 1, 2002, NRDC filed Civil Action No. 02–1330 against DOI and BLM as a case related to the cases already filed by Judicial Watch and NRDC. *See* LCvR 40.5(b) and (c). The parties then briefed cross-motions for summary judgment in that case.

## II. DISCUSSION

### A. The Freedom of Information Act

The fundamental purpose of the Freedom of Information Act is to assist citizens in discovering "what their government is up to." *United States Department of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). The FOIA therefore strongly favors openness, since Congress recognized in enacting it that an informed citizenry is "vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978); *see also Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny"). As such, "the Act is broadly conceived," *EPA v. Mink*, 410 U.S. 73, 79–80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), and "disclosure, not secrecy, is the dominant objective of the Act." *Department of the Air Force v. Rose*, 425 U.S. at 361, 96 S.Ct. 1592.

 Under the Freedom of Information Act, an agency may withhold documents responsive to a FOIA request only if the responsive documents fall within one of nine enumerated statutory exemptions. *See* 5 U.S.C. § 552(b). Consistent with the Act's "goal of broad disclosure, these exemptions have been consistently given a narrow compass," *United States Department of Justice v. Tax Analysts*, 492 U.S. 136, 151, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989), and there is a "strong presumption in favor of disclosure." *United States Department of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). The agency bears the burden of justifying any withholding, and the court reviews the agency claims of exemption *de novo*. *See* § 552(a)(4)(B); *see also United States Department of State v. Ray*, 502 U.S. at 173–74, 112 S.Ct. 541; *Assassination Archives and Research Center v. CIA*, 334 F.3d 55, 57 (D.C.Cir.2003); *Summers v. Department of Justice*, 140 F.3d 1077, 1079–80 (D.C.Cir.1998). To enable the court to

determine whether documents were properly withheld, the agency must provide a detailed description of the information withheld through the submission of a so-called *"Vaughn* Index," sufficiently detailed affidavits or declarations, or both. *See Oglesby v. United States Department of the Army,* 79 F.3d 1172, 1178 (D.C.Cir. 1996); *Vaughn v. Rosen,* 484 F.2d 820, 827–28 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

■ Furthermore, the FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided … after deletion of the portions which are exempt." 5 U.S.C. § 552(b). This comports with the policy of disclosure and prevents the withholding of entire documents, *see Billington v. U.S. Department of Justice,* 233 F.3d 581, 586 (D.C.Cir.2000), unless the agency can demonstrate that the non-exempt portions of a document are "inextricably intertwined with exempt portions." *Trans–Pacific Policing Agreement v. United States Customs Serv.,* 177 F.3d 1022, 1027 (D.C.Cir.1999) (quoting *Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d 242, 260 (D.C.Cir. 1977)). To withhold the entirety of a document, the agency must demonstrate that it cannot segregate the exempt material from the non-exempt and disclose as much as possible. *See Kimberlin v. Department of Justice,* 139 F.3d 944, 949–50 (D.C.Cir. 1998).

■ The Court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits or declarations, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d

265 (1986). In a FOIA case, the Court may award summary judgment solely on the basis of information provided by the department or agency in affidavits or declarations when the affidavits or declarations describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981); *see also Vaughn v. Rosen,* 484 F.2d at 826–28. Agency affidavits or declarations must be "relatively detailed and non-conclusory …." *SafeCard Services, Inc. v. SEC,* 926 F.2d 1197, 1200 (D.C.Cir.1991). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *Id.* (internal citation and quotation omitted). An agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements." *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978) (internal citation and quotation omitted).

### B. Fee Waiver and Exhaustion

Generally, there are three levels or limitations on charging fees in connection with FOIA requests. An agency may charge fees for the search, review and duplication of records if the records are requested for a commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(I). If the records are sought for a non-commercial use and the request is made by an educational or non-commercial scientific institution or by a representative of the news media, an agency may charge fees only for duplication. 5

U.S.C. § 552(a)(4)(A)(ii)(II). In all other cases, an agency may charge fees for the search for and duplication of records. 5 U.S.C. § 552(a)(4)(A)(ii)(III). In addition, the FOIA provides that documents shall be provided either at no charge or at a reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

### 1. FEMA

■ FEMA received Judicial Watch's FOIA request on April 19, 2001. The request included a request for a public interest fee waiver and maintained that Judicial Watch "functions, in part, as a member of the news media." *See* Motion for Summary Judgment by Defendants Department of Treasury and Federal Emergency Management Agency ("Treasury and FEMA Mot."), Ex. 1 at 5. On May 21, 2001, FEMA responded to plaintiff's request stating that Judicial Watch had failed to provide sufficient information to support its request for a waiver. *See id.*, Ex. 2 at 1. Plaintiff appealed the provisional denial of its fee waiver on May 29, 2001. *See id.*, Ex. 3. On June 26, 2001, FEMA's general counsel denied Judicial Watch's appeal. *See id.*, Ex. 4.

FEMA argues that Judicial Watch's request for a fee waiver was properly denied because documents received by Judicial Watch would not contribute significantly to the public's understanding of government operations and because plaintiff is not a member of the news media. *See* Treasury and FEMA Mot. at 2. Because the Court concludes that Judicial Watch is entitled to a public interest fee waiver, it is unnecessary to determine whether it is also a representative of the news media. *See*

*Long v. Bureau of Alcohol, Tobacco and Firearms,* 964 F.Supp. 494, 498 (D.D.C. 1997); *Project on Military Procurement v. Department of the Navy,* 710 F.Supp. 362, 368 (D.D.C.1989).

■ The FOIA provides that documents shall be provided either at no charge or at a reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Actions challenging the denial of a fee waiver are determined *de novo,* but judicial review is limited to the record before the agency. *See* 5 U.S.C. § 552(a)(4)(A)(vii).

FEMA's own regulations mimic the FOIA language and provide that FEMA may waive all fees when "disclosure of the information requested is deemed to be in the public interest because it is likely to contribute significantly to the understanding of the operations or activities of the Federal Government and is not primarily in the commercial interest of the requester." 44 C.F.R. § 5.43(a). FEMA regulations provide:

A fee waiver request shall indicate how the information will be used, to whom it will be provided, whether the requester intends to use the information for resale at a fee above actual cost, any personal or commercial benefits that the requester reasonably expects to receive by the disclosure, provide justification to support how release would benefit the general public, the requester's and/or intended user's identity and qualifications, expertise in the subject area and ability and intention to disseminate the information to the public.

44 C.F.R. § 5.43(b). Fee waiver requests must be made with "reasonable specificity"

and be based on more than just "conclusory allegations." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C.Cir. 2003).

Recent case law suggests that the public interest exception should be viewed in an expansive manner. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d at 1315 (Judicial Watch's FOIA requests to IRS and Department of Treasury demonstrated "with reasonable specificity that disclosure of the information sought will serve the public interest.") Judicial Watch maintains that the D.C. Circuit's decision in *Rossotti* requires that the fee waiver be granted in this case as well. The government contends that the facts presented here justify a result different from the one reached in *Rossotti*. Specifically, the government points to the difference in subject matter between the FOIA request in *Rossotti* and the FOIA request at issue here. The government also contends that the instant request is not as specific and targeted as that in *Rossotti* and does not adequately address how release of the documents will contribute to the public's understanding of the operations or activities of government. The Court disagrees.

 A requester's entitlement to a fee waiver under the public interest exception is determined by application of a four factor test: (1) whether the subject of the records sought concerns the agency's operations or activities; (2) whether the records sought likely will contribute to an understanding of the agency's operations or activities; (3) whether the records are likely to contribute to the general public's understanding of the agency's operations or activities; and (4) the significance of the contribution to the general public's understanding. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d at 1312.[2] Particularly relevant to an analysis of the third factor is how the requester intends to convey the information to the general public. *See id.* at 1312; *see also Judicial Watch, Inc. v. United States Department of Justice*, 185 F.Supp.2d 54, 62 (D.D.C.2002) (requester's ability and intention to convey or disseminate requested information to the public is significant).

The *Rossotti* decision makes clear that Judicial Watch has satisfied the third factor, involving its expected dissemination of the FOIA information to the general public. In criticizing the government's claim that Judicial Watch had failed to state that it intended to disseminate the FOIA documents and how it intended to do so, the court in *Rossotti* responded:

> In fact, however, the [FOIA request] letter not only explains that Judicial Watch's mission is obtaining information under FOIA, but also lists nine ways in which it communicates collected information to the public: press releases; a newsletter with a monthly circulation of over 300,000 copies nationwide; a website on which people can view copies of

---

**2.** Although these factors originate from the IRS' implementing regulations, FEMA's regulations are substantively identical and the *Rossotti* decision is binding precedent. FEMA's letter denying Judicial Watch's request for a fee waiver identified four areas which FEMA said Judicial Watch had not sufficiently addressed in its fee waiver request:

- Ability to disseminate information to the public: where the information would be published and whether there is a contract with a magazine or newspaper to write an article for publication;
- How disclosure would significantly contribute to the public's understanding of the operations or activities of the FEMA;
- Who in the public would benefit and how;
- Current level of public attention to the general subject.

*See* Treasury and FEMA Mot., Ex. 2. These general areas are encompassed by the discussion in *Rossotti*.

documents and that has logged up to 1,000,000 visitors in a single day; an "Infonet" list serve with over 60,000 subscribers who receive daily updates on Judicial Watch lawsuits, FOIA requests, and investigations; congressional testimony; a nationally syndicated news and information television show Judicial Watch helps to produce; a Judicial Watch-produced weekly radio program which airs nationwide on thirty-six radio stations and the Internet; appearances by Judicial Watch employees on television and radio programs; and conferences organized by Judicial Watch. Judicial Watch might have added that it will use these methods to publicize any information it obtains from this request, but the government points to nothing in FOIA, the IRS regulation, or our case law requiring such pointless specificity.

*Judicial Watch, Inc. v. Rossotti,* 326 F.3d at 1314; *see also Judicial Watch, Inc. v. United States Department of Justice,* 185 F.Supp.2d at 62. Judicial Watch's letter to FEMA in the instant case outlines an identical litany of means by which it publicizes information obtained through FOIA requests. *See* Treasury and FEMA Mot., Ex. 1 at 3–4. The third factor therefore is satisfied.

With respect to the remaining three factors, Judicial Watch's FOIA request asks for documents that relate to:

1. [The] Bush Administration energy task force (the Energy Policy Development Group) and its deliberations.

2. Communications to and from the Bush Administration energy task force.

3. Communications between members of the task force and its administrators, Andrew Lundquist and Karen Knutson.

J.W. Compl., Ex. 1. Judicial Watch offers the following explanation regarding the public interest underpinning its request:

The American people should be made aware of the deliberations that constitute national energy policy proposals—especially in light of the power crisis in California and other parts of the nation.

\* \* \* \* \* \*

[T]he public is always well served when it knows how government activities have been conducted—especially in times of crisis.

Thus, we are convinced that the information requested will be meaningfully informative in increasing public understanding of energy policy deliberations. The secretive nature of the meetings thus far surely raises questions that we seek to answer.

J.W. Compl., Ex. 1 at 5.

"In order to obtain a fee waiver, the requesting party has the burden of explaining with reasonable specificity how and why the disclosure of this particular information will serve the public interest." *See Judicial Watch, Inc. v. United States Department of Justice,* 185 F.Supp.2d at 61. Unlike the situation in *Rossotti,* which involved a FOIA request specifically targeted at information regarding whether the Commissioner of the IRS had awarded a government contract to a company he cofounded and in which he held stock, *see Judicial Watch, Inc. v. Rossotti,* 326 F.3d at 1313, the instant request involves a general inquiry relating to the NEPDG and the national energy policy deliberations. *See* J.W. Compl., Ex. 1 at 1–2. The fact that Judicial Watch has framed its request in broad and general terms, however, does not mean that it has failed to meet its burden to justify a fee waiver under the public interest exception.

Judicial Watch's fee waiver request specified the "identifiable operations or activities" of FEMA that are implicated by the request: FEMA's communications

with and involvement in the NEPDG and the energy policy deliberations. *See Judicial Watch, Inc. v. United States Department of Justice*, 185 F.Supp.2d at 61. The request also "provide[s] details specific to this FOIA request indicating how the information sought will contribute to an increased public understanding of government operations or activities." *Id.* Judicial Watch explains that the documents released will contribute to a public understanding of the substance of the energy policy deliberations and the development of federal energy policy. *See* J.W. Compl., Ex. 1 at 5. Finally, it states that the information requested will contribute "significantly" to the public's understanding because there is no indication from the government that the documents requested are already available to the general public. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d at 1314. The Court has little trouble in concluding that the subject matter of Judicial Watch's request—the development of, and the deliberations going into the development of, national energy policy by the President, the Vice President and virtually every possibly relevant agency and department of the Executive Branch—is relevant to the public's understanding of government. In light of the court of appeals decision in *Rossotti*, the Court therefore concludes that the remaining factors for granting a public interest exception have been satisfied and FEMA should have granted Judicial Watch's request for a fee waiver.[3]

### 2. Department of the Treasury

 "Requesters may seek judicial review of denials of fee waivers only after exhausting specified administrative remedies." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d at 1310. A FOIA requester whose fee waiver is denied must exhaust administrative remedies prior to seeking judicial relief. *See id.; Oglesby v. United States Department of the Army*, 920 F.2d 57, 61–62 (D.C.Cir.1990). If, however, "the agency fails to respond to a waiver request within 20 days, the requester is deemed to have constructively exhausted administrative remedies and may seek judicial review [immediately]." *Public Citizen, Inc. v. Department of Education*, 292 F.Supp.2d 1, 4 (D.D.C.2003) (citing *Judicial Watch, Inc. v. Rossotti*, 326 F.3d at 1310). This follows from the FOIA's constructive waiver provision which provides that "[a]ny person making a request to any agency for records ... shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions. ..." 5 U.S.C. § 552(a)(6)(C); *see also Judicial Watch, Inc. v. United States Department of Energy*, 191 F.Supp.2d at 140. The agency must determine within twenty days whether to comply with the request and must immediately notify the requestor of the reasons for the determination and the right to appeal any adverse determination. *See* 5 U.S.C. § 552(a)(6)(A)(i).

On April 24, 2001, Treasury received Judicial Watch's FOIA request, dated April 19, 2001, including its fee waiver request. *See* Treasury and FEMA Mot., Declaration of Alana Johnson ("Johnson Decl.") at ¶ 2 and Ex. A. On May 1, 2001, Treasury denied Judicial Watch's request for expedited processing of its FOIA request. *See id.*, Declaration of John Hambour ("Hambour Decl.") at ¶ 4 and Ex. B.

---

**3.** Judicial Watch also argues that it is entitled to a fee reduction as a representative of the news media. Because the Court has determined that Judicial Watch is entitled to a public interest fee waiver, there is no need to address the question of whether Judicial Watch also is entitled to a waiver of search and review costs as a representative of the news media. *See supra* at 290.

No administrative appeal of this decision was filed by Judicial Watch. *See* Johnson Decl. at ¶ 6. Judicial Watch filed suit on May 9, 2001. *See* Complaint.[4] On July 10, 2001, Treasury sought additional information about the FOIA fee waiver request and provisionally denied the fee waiver request. *See id.,* Hambour Decl. at ¶ 5 and Ex. C. Judicial Watch did not reply. *See* Hambour Decl. at ¶ 6. On August 10, 2001, Treasury sent Judicial Watch a letter confirming the fee waiver denial and advising Judicial Watch of its right to appeal. *Id.* at ¶ 7. Judicial Watch did not file an appeal. Johnson Decl. at ¶ 6. Because Judicial Watch never contacted Treasury to make arrangement for payment of the required fees and never appealed the fee waiver denial, Treasury stopped processing the FOIA request. *Id.*

Treasury argues that because Judicial Watch failed to exhaust its administrative remedies, its FOIA suit should be dismissed. *See* Treasury and FEMA Mot. at 9. Judicial Watch responds that it constructively exhausted its administrative remedies with respect to Treasury by filing its lawsuit after the statutory exhaustion period had expired and before it received any substantive response from the Department of the Treasury. *See* Judicial Watch's Opposition to the Motion for Summary Judgment by Defendants Department of Treasury and Federal Emergency Management Agency ("Treasury and FEMA Opp.") at 5–6.

The factual situation presented in *Rossotti* is virtually identical to that of the instant case. In *Rossotti,* plaintiff Judicial Watch filed a FOIA request with the Department of the Treasury on June 6, 2001 and sought a fee waiver in connection with its request. *See Judicial Watch, Inc. v. Rossotti,* 326 F.3d at 1311. On July 10, 2001, the Department of the Treasury requested additional information from Judicial Watch regarding its fee waiver request. Judicial Watch filed suit on July 25, 2001, never having responded to Treasury's letter. The district court concluded that Judicial Watch had failed to exhaust its administrative remedies because the July 10 letter from the Department of the Treasury was a substantive response, but the court of appeals reversed the district court's dismissal of the complaint. *See id.* at 1311, 1315.[5]

The May 1, 2001 letter from the Department of the Treasury to Judicial Watch in this case says only that Judicial Watch's request for expedited processing was rejected and appealable. It makes no substantive response to the FOIA request or the fee waiver request, and states only that "every effort will be made to respond to your FOIA request by May 30, 2001." Hambour Decl., Ex. B. But May 30, 2001 was outside of the twenty-day statutory exhaustion period. In any event, no further correspondence was received from Treasury until July 10, 2001. Hambour Decl. at ¶ 5. Judicial Watch therefore con-

---

4. The Court, in denying defendants' motion to dismiss Judicial Watch's original complaint, permitted the plaintiff to file a supplemental complaint that would be deemed filed as of May 18, 2001, the date defendants suggested would have been the appropriate filing date. *See Judicial Watch, Inc. v. United States Department of Energy,* 191 F.Supp.2d at 139–41.

5. The court of appeals did not explicitly find that the Department of the Treasury's initial response letter did not constitute a "substan-

tive response" and that Judicial Watch therefore had constructively exhausted its administrative remedies by filing suit. The court did, however, tacitly acknowledge that the July 10, 2001 letter was not a substantive response because the court simply assumed that Judicial Watch's suit was proper so long as its letter adequately stated a case for the public interest fee waiver. *See Judicial Watch, Inc. v. Rossotti,* 326 F.3d at 1311.

structively exhausted its administrative remedies by filing suit; no appeal was necessary. *See Judicial Watch, Inc. v. Rossotti,* 326 F.3d at 1310; *Public Citizen, Inc. v. Department of Education,* 292 F.Supp.2d at 4. Defendant Department of the Treasury's motion for summary judgment on exhaustion grounds therefore must be denied.

Because Judicial Watch constructively has exhausted its administrative remedies with respect to its FOIA request and its fee waiver request, it is appropriate for the Court to reach the issue of Judicial Watch's right to a fee waiver. *See Judicial Watch, Inc. v. Rossotti,* 326 F.3d at 1315 (reversing district court's dismissal of FOIA claim for failure to exhaust because the FOIA request did qualify for public interest exception). The FOIA request sent to Treasury was essentially identical to that sent to FEMA. As the Court has discussed above, the request letter to FEMA was sufficient to qualify Judicial Watch for the public interest fee waiver. Treasury therefore also is directed to grant Judicial Watch's request for a fee waiver.

### 3. Department of the Interior

■ DOI granted NRDC's fee waiver request with respect to NRDC's first three FOIA requests, but then denied NRDC's blanket fee waiver request with respect to NRDC's May 6, 2002 request, finding that it was "clear that not all records requested" would make a significant contribution to the understanding of the general public. Defendants Department of the Interior and Bureau of Land Management's Motion for Summary Judgment ("DOI and BLM Mot."), Declaration of Sue Ellen Sloca, Ex. K at 5. Specifically, DOI granted NRDC's fee waiver with respect to all records other than "working level records meeting the threshold of exemption 5." *Id.* at 7. DOI contended that because the deliberative portions of the records sought would be withheld, releasing the non-exempt portions would "not make a *significant* contribution to the understanding of the general public." *Id.* (emphasis in original). DOI argues that its analysis in denying the fee waiver "properly focused on the informative value and relative contribution to the public's understanding of the expected *disclosure,* not on the purpose or objective of the *request.*" DOI and BLM Mot. at 43 (emphasis in original).

■ Under the FOIA, the agency bears the burden of justifying nondisclosure. *See* 5 U.S.C. § 552(a)(4)(B). It would be contrary to the express provisions of the FOIA to "invert the burden of proof" and force a plaintiff not only to demonstrate that it satisfies the public interest exception analysis and is entitled to a fee waiver, but also to demonstrate that the defendant agency's contemplated withholdings are not properly claimed. *Project on Military Procurement v. Department of the Navy,* 710 F.Supp. at 367. "A fee waiver request should be evaluated based on the face of the request and the reasons given by the requester in support of the waiver," not on the possibility that the records may ultimately be determined to be exempt from disclosure. *Carney v. United States Department of Justice,* 19 F.3d 807, 815 (2d Cir.1994). While in some rare cases it may be reasonable for an agency to deny a fee waiver because the FOIA request is for "patently exempt documents," *id.,* the Court is unconvinced in this case that NRDC's FOIA requests sought "patently exempt" documents.

Furthermore, DOI has now conducted the requested search in light of NRDC's assurance of payment if the Court upholds DOI's fee waiver determination. *See* NRDC DOI Mot., Declaration of Sharon Buccino ("Buccino Decl.") at ¶¶ 46, 50. NRDC has already received documents

from its request that contributed to the public's understanding even prior to the litigation of the proper scope of Exemption 5. *See id.* The Court thus concludes that DOI should have granted NRDC's fee waiver request, and DOI therefore is directed to grant NRDC's request for a fee waiver.

### C. Adequacy of Search

■■■■ Before it can obtain summary judgment in a FOIA case, an agency "must show, viewing the facts in the light most favorable to the requester, that ... [it] 'has conducted a search reasonably calculated to uncover all relevant documents.'" *Steinberg v. United States Department of Justice,* 23 F.3d 548, 551 (D.C.Cir.1994) (quoting *Weisberg v. United States Department of Justice,* 745 F.2d 1476, 1485 (D.C.Cir.1984)). In determining the adequacy of a FOIA search, the Court is guided by principles of reasonableness. *See Oglesby v. United States Department of the Army,* 920 F.2d at 68; *Int'l Trade Overseas, Inc. v. Agency for Int'l Development,* 688 F.Supp. 33, 36 (D.D.C.1988). While there is no requirement that an agency search every record system, *see Truitt v. Department of State,* 897 F.2d 540, 542 (C.A.D.C.1990), or that a search be perfect, *see Meeropol v. Meese,* 790 F.2d 942, 955–56 (C.A.D.C.Cir.1986), the search must be conducted in good faith using methods that are reasonably expected to produce the information requested if it exists. *See Valencia–Lucena v. United States Coast Guard,* 180 F.3d 321, 325–26 (D.C.Cir.1999); *Campbell v. United States Department of Justice,* 164 F.3d 20, 27 (D.C.Cir.1998).[6]

### 1. "Agency Records"/Agency Employees Serving on Task Forces

In this case, NRDC argues that the search of DOE and DOI records was inadequate and not "reasonably calculated to uncover all relevant documents" (1) because DOE purposefully excluded from its search the records of those DOE employees detailed to the Office of the Vice President and (2) because the Bureau of Land Management failed to search the records of Ronald Montagna, the DOI representative to the White House Task Force on Energy Project Streamlining. NRDC claims that both the DOE employees detailed to the Office of the Vice President and Mr. Montagna are agency employees and that their records therefore constitute "agency records" for FOIA purposes. According to the NRDC, it does not matter for this analysis that the employees were temporarily working outside of their agencies or that the records in question were not created or housed at their agencies.

■■■ The FOIA provides that an agency may not improperly withhold "agency records." *United States Department of Justice v. Tax Analysts,* 492 U.S. 136, 142, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989). Two requirements must be met before materials will be considered to be "agency records." First, the agency must "either create or obtain" the documents "as a prerequisite to its becoming an 'agency record' within the meaning of the FOIA." *Id.* at 144, 109 S.Ct. 2841 (quoting *Forsham v. Harris,* 445 U.S. 169, 182, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980)). Second the agency "must be in control of the requested materials at the time the FOIA request is

**6.** Plaintiff Judicial Watch does not challenge the adequacy of the search of DOI, USDA, OMB, EPA, DOE, DOT and DOC. *See* J.W. DOT and DOC Opp.; J.W. DOE and EPA Opp.; J.W. OMB, DOI and USDA Opp. The Court is satisfied with the declarations presented by USDA, EPA, DOT and DOC regarding the searches conducted in response to plaintiff Judicial Watch's FOIA request. The challenges to the searches of DOE, DOI and BLM raised by NRDC are discussed in this section of the Opinion.

made." *Id.* at 145, 109 S.Ct. 2841. This means that the materials must have "come into the agency's possession in the legitimate conduct of its official duties." *Id.*

██ With respect to the first prong of *Tax Analysts*, the relevant issue is whether an agency covered by the FOIA has either "created" or "obtained" the material sought. *United States Department of Justice v. Tax Analysts*, 492 U.S. at 146, 109 S.Ct. 2841. In this regard, the D.C. Circuit has held that there is "no basis" in the FOIA or its legislative history to view an agency employee as "distinct from his [or her] department [or agency] for FOIA purposes." *Ryan v. Department of Justice*, 617 F.2d 781, 787 (D.C.Cir.1980). Once an agency employee is determined to be such, he or she cannot be viewed as a non-agency employee "in selected contexts on a case-by-case basis." *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F.Supp.2d 20, 39 (D.D.C. 2002), *aff'd*, 334 F.3d 1096 (D.C.Cir.2003), *cert. granted*, —— U.S. ——, 124 S.Ct. 958, 157 L.Ed.2d 793 (2003) (quoting *Ryan v. Department of Justice*, 617 F.2d at 788–89).

██ As for the second prong of *Tax Analysts*—whether the agency is in control of the materials at the time of the FOIA request—the Supreme Court has noted that disputes over "control" should be infrequent because requested materials generally are in the agency's possession. *United States Department of Justice v. Tax Analysts*, 492 U.S. at 146 n. 6, 109 S.Ct. 2841. The Court in *Tax Analysts* declined to consider what the outcome would be if the materials were on loan to another agency or purposefully had been routed out of the agency to avoid a FOIA request. *Id.* It is clear, however, that the actual physical location of the documents is not dispositive; the issue is actual or constructive "control." *See Ryan v. Depart-*

*ment of Justice*, 617 F.2d at 785 ("A simple possession standard would permit agencies to insulate their activities from FOIA disclosure by farming out operations to outside contractors."); *see also Burka v. United States Department of Health and Human Services*, 87 F.3d 508, 515 (D.C.Cir.1996) (HHS had "constructive control" of data tapes in the possession of research firm). This case presents one of those infrequent situations where the documents in question, although created or obtained by agency employees, are located elsewhere.

██ The court of appeals recently reiterated the four factors that have been considered in determining whether an agency has sufficient "control" over a document to make it an "agency record":

(1) the intent of the document's creator to [either] retain or relinquish control over the records;

(2) the ability of the agency to use and dispose of the record as it sees fit;

(3) the extent to which agency personnel have read or relied upon the document; and

(4) the degree to which the document was integrated into the agency's records system or files.

*United We Stand America, Inc. v. Internal Revenue Service*, 359 F.3d 595, 599 (D.C.Cir.2004) (quoting *Burka v. United States Department of Health and Human Services*, 87 F.3d at 515 (citations omitted)). This analysis has been used both in situations in which the agency has actual possession of a document that had been created elsewhere, *see Tax Analysts v. United States Department of Justice*, 845 F.2d at 1069, and those in which information created at the behest of the agency was neither created by the agency nor stored at the agency. *See Burka v. Unit-*

*ed States Department of Health and Human Services,* 87 F.3d at 515.

■ In its most recent decision on the issue of control, a case involving an agency response to a congressional request for information, the court of appeals focused not on the four-factor test so much as on the first factor only, the creator's intent (in this case, the agency), in determining the scope of the term "agency record." *United We Stand America, Inc. v. Internal Revenue Service,* 359 F.3d at 602–03. The court specifically focused on whether the materials "have come into the agency's possession in the legitimate conduct of its official duties" as determinative of the issue of "control," *id.* at 602 (quoting *United States Department of Justice v. Tax Analysts,* 492 U.S. at 145, 109 S.Ct. 2841), and noted that to provide blanket protection for documents created by an agency or its employees in responding to a congressional inquiry "would 'exempt from FOIA's purview a broad array of materials otherwise clearly categorizable as agency records, thereby undermining the spirit of broad disclosure that animates the Act.'" *Id.* at 603 (quoting *Paisley v. CIA,* 712 F.2d 686, 696 (D.C.Cir.1983)). So long as the agency or its employee creates a document "in the course of its official duties," it therefore remains an agency record. *Id.* at 602.

**a. Department of Energy**

■ NRDC argues that DOE improperly failed to search the records of Andrew Lundquist, a DOE employee who was detailed from DOE to the White House to serve as the NEPDG Executive Director and Chair of the NEPDG Working Group, and the other DOE employees who served as staff to the NEPDG. *See* NRDC DOE Mot. at 12.[7] DOE responds that the documents in question were not "agency records" for purposes of the FOIA. *See* DOE Opp. at 5. DOE maintains that while Mr. Lundquist was paid by DOE, he worked for the Office of the Vice President, he was not physically at DOE, and was not given any DOE assignments; furthermore, DOE never "obtained" any records he may have created or maintained while acting as Executive Director of the NEPDG. *See id.* Similarly, DOE argues, the other five employees assigned to NEPDG did not remove their NEPDG records, with the exception of two final reports, from the Office of the Vice President to DOE. *See id.*[8]

Andrew Lundquist was hired by DOE on February 1, 2001. On February 12, 2001, he was assigned to work in the Office of the Vice President. *See* Defendant Department of Energy's Reply in Support of

---

**7.** NRDC has requested discovery with respect to the adequacy of DOE's search. *See* NRDC DOE Mot. at 20. The Court has determined that it is fully capable of deciding the issues raised in the various motions for summary judgment with the declarations already submitted and that discovery is not necessary or appropriate.

**8.** There is no issue in this case about the Vice President himself. The Vice President and the Office of the Vice President are not "agencies" for purposes of the FOIA. *See Judicial Watch, Inc. v. National Energy Policy Development Group,* 219 F.Supp.2d at 55 (concluding that FOIA claim against the Vice President

must be dismissed because Vice President is not an agency). Units within the Executive Office of the President whose "sole function is to advise and assist the President" are not agencies for purposes of the FOIA. *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 156, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). Clearly, the Vice President and the Office of the Vice President function in that capacity. *See Meyer v. Bush,* 981 F.2d 1288 (D.C.Cir.1993) (casting doubt on whether Vice President could be the head of FOIA agency); *Judicial Watch, Inc. v. National Energy Policy Development Group,* 219 F.Supp.2d at 55.

Motion for Summary Judgment and Opposition to Plaintiff NRDC's Motion for Summary Judgment ("DOE Rep."), Declaration of Dr. Abraham Haspel ("Haspel Decl.") at ¶¶ 4–5. While assigned to the Office of the Vice President, it is asserted, Mr. Lundquist did not receive assignments from DOE and was not supervised on a day-to-day basis by DOE personnel. Mr. Lundquist maintained no office at DOE. Mr. Lundquist remained assigned to the Office of the Vice President until his resignation from DOE and from government on March 20, 2002. *See id.* at ¶¶ 7–11. Throughout the entire period that he worked in the Office of the Vice President he was paid out of DOE appropriations. *See* DOE NRDC Rep. at 5. DOE's declaration indicates that Mr. Lundquist neither maintained records at DOE nor left records at DOE when he resigned from the government. *See* Haspel Decl. at ¶ 11.[9]

Five other DOE employees also served as staff to the NEPDG: Kjerstan Drager, Karen Knutson, Elena Melchert, James Sims and Charles Smith. *See* DOE NRDC Rep., Second Declaration of Susan Beard ("Sec. Beard Decl.") at ¶¶ 4–8. They, too, were paid out of DOE appropriations. *See* DOE NRDC Rep. at 5. None of these employees worked on DOE controlled or administered work assignments during his or her detail to the Office of the Vice President. The only documents relating to their work that were brought to DOE were copies of the public NEPDG report. *See* Sec. Beard Decl. at ¶ 9. DOE indicates that it did not exercise authority over these individuals during their assignments to the Office of the Vice President

and that they did not occupy offices at DOE during the term of their assignments. *See id.* at ¶ 10.

Despite DOE's arguments to the contrary, the Court concludes that the records of Mr. Lundquist and the other DOE employees who were detailed to the Office of the Vice President were "created or obtained" by DOE. As the court of appeals has noted, "the President has a choice between using his staff to perform a function and using an agency [employee] to perform it" and "[w]hile not always substantively significant, these choices are often unavoidably significant for FOIA purposes, because the Act defines agencies as subject to disclosure and presidential staff as exempt." *Ryan v. Department of Justice,* 617 F.2d at 789. It is inappropriate to view an agency employee as distinct from the agency itself for FOIA purposes. *See id.* at 787 (declining to distinguish between the Attorney General acting in his capacity as advisor to the President and in his capacity as head of the Department of Justice for FOIA purposes). The Office of the Vice President chose to borrow Department of Energy personnel to staff the NEPDG rather than to hire personnel for the Office of the Vice President or to use existing White House personnel. It follows from established case law that such persons remain agency employees subject to the FOIA. The citizens' right to know "what their government is up to," *United States Department of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. at 773, 109 S.Ct. 1468, cannot be defeated simply by detailing an agency employee to

---

**9.** The Haspel Declaration also states, however, that "Mr. Lundquist's Position Description states that his duties included preparing briefs and memoranda for the President, Vice President, *the Secretary of Energy, and the Assistant Secretary* to apprise them of current developments on policy determination, chairing

meetings of interagency working groups, coordinating interagency review and policy development, and organizing interagency studies, analyses and policy papers on matters as directed by the President, Vice President, *the Secretary, and Assistant Secretary.*" Haspel Decl. at ¶ 6 (emphasis added).

a task force operating out of the White House or some other non-agency.

 Furthermore, merely because an employee is not physically located at his or her agency of employment does not mean that the employee ceases to be an agency employee capable of creating records on the agency's behalf. *See Burka v. United States Department of Health and Human Services,* 87 F.3d at 515 (data tapes created by offsite firm were "created" by agency); *Ryan v. Department of Justice,* 617 F.2d at 785 (agencies cannot "insulate their activities from FOIA disclosure by farming out operations...."). The physical location in which the DOE employees create, generate, obtain or review records does not determine whether the records are agency records subject to the FOIA. *See Ryan v. Department of Justice,* 617 F.2d at 785.

A more difficult question is posed by the second prong of the *Tax Analysts* test, whether the DOE had "control" of the records of Mr. Lundquist and the other agency employees at the time of the FOIA request. Clearly any records or files of Mr. Lundquist and the other staff members that were at DOE at the time the FOIA requests were made are subject to the FOIA and must be searched. But most of the documents in question resided then and now in the Office of the Vice President and were not integrated into DOE's records system. *See supra* at 297–99.

NRDC correctly notes that "control" is determined at the time the FOIA request is made, which in this case was April 26, 2001. *See United States Department of Justice v. Tax Analysts,* 492 U.S. at 145, 109 S.Ct. 2841.[10] Mr. Lundquist and all of the other employees in question were still detailed to the Office of the Vice President

at the time and were still working with the requested documents on NEPDG matters. *See* Haspel Decl. at ¶ 8; Sec. Beard Decl. at ¶¶ 4–8. The records in question therefore were in both the possession and the control of these DOE employees in the legitimate conduct of the employees' official duties, as of the date of the FOIA request. *See United States Department of Justice v. Tax Analysts,* 492 U.S. at 145, 109 S.Ct. 2841; NRDC DOE Rep. at 11. Because these employees are not distinct from their agencies, *see Ryan v. Department of Justice,* 617 F.2d at 787, the documents thus were in the actual control of the agency employees and the constructive control of DOE. *See Burka v. United States Department of Health and Human Services,* 87 F.3d at 515. DOE's failure to search the records of these individuals therefore renders its search inadequate. DOE is directed to search the files of these individuals for responsive documents.

b. Department of the Interior and Bureau of Land Management

 Ronald Montagna, an employee of the Department of the Interior, served on the White House Task Force on Energy Project Streamlining ("Streamlining Task Force") which was under the chairmanship of the Council on Environmental Quality ("CEQ"). *See* Defendants' Reply in Support of DOI and BLM's Motion for Summary Judgment and Opposition to NRDC's Motion for Summary Judgment ("DOI and BLM Rep."), Declaration of Phillip A. Cooney ("Cooney Decl.") at ¶¶ 1,6. The Streamlining Task Force was established pursuant to Executive Order 13212 to "work with and monitor federal agencies' efforts to expedite their review of permits or similar actions, as necessary, to accelerate the completion of energy-related projects, while maintaining safety, pub-

---

**10.** April 19, 2001, in the case of the Judicial Watch FOIA request.

lic health, and environmental protections" *Id.* at ¶ 3. The Streamlining Task Force consists of CEQ staff and staff from the agencies identified in the Executive Order. *See id.* at ¶¶ 4–5. The government's declaration specifically identifies Mr. Montagna as the DOI representative to the Streamlining Task Force and explains:

> An agency representative is an individual who, as a part of the regular responsibilities of his or her agency position is assigned to represent his or her employing agency as a member of an interagency task force, board, counsel or committee. Therefore, at all times during his or her assignment to [the Streamlining Task Force], each agency representative remains an employee of his or her agency and remains subject to the authorities and requirements of their employer agencies.

*See* Cooney Decl. at ¶ 5.[11]

In this situation, it is even clearer than in the circumstances where DOE employees were detailed to the Office of the Vice President that the documents were created or obtained by DOI.[12] It is undisputed that Mr. Montagna was acting as a DOI employee; the government's own declaration specifically states that Mr. Montagna was acting as a DOI agency representative to the Streamlining Task Force. For the reasons previously discussed, the fact that the Streamlining Task Force is housed at the Department of Energy and the records generated through Mr. Montagna's work at the Streamlining Task Force are physically located at the Department of Energy offices used by the Streamlining Task Force is irrelevant. *See* DOI and BLM Rep. at 12–13. Thus, any records "obtained" or "created" by Mr. Montagna were records obtained or created by DOI. *See supra* at Section C(1)(a). The first requirement of *Tax Analysts* therefore is satisfied with respect to Mr. Montagna.

The next question is whether DOI was in "control" of Mr. Montagna's records at the time of the FOIA request. *See United States Department of Justice v. Tax Analysts*, 492 U.S. at 145, 109 S.Ct. 2841. Because Mr. Montagna was acting as a DOI agency representative while serving on the Streamlining Task Force, the Task Force materials that came into his possession did so "in the legitimate conduct of [his] official duties." *See id.* Furthermore, like the DOE employees, discussed *supra* at Section C(1)(c), Mr. Montagna was still serving on the Streamlining Task Force at the time of NRDC's February 14, 2002 FOIA request.[13] Indeed, it appears that he continues to serve up to the present moment. His documents, therefore, are in his possession and control, and thus in the possession and control of the agency by which he is employed. The Court con-

---

11. The declaration states that Robert Middleton was also a Department of the Interior agency representative to the Streamlining Task Force. *See* Cooney Decl. at ¶ 6. NRDC's motion for summary judgment does not address the records of Mr. Middleton.

12. Although Mr. Montagna is a BLM employee, defendant's reply brief assumes that it is DOI that is implicated with respect to the adequacy of this search and Mr. Montagna is alternately referred to as a BLM employee and a DOI employee. *See* DOI and BLM Rep. at 11–13. Although the Court addresses this section in the context of the adequacy of DOI's search, the Court assumes that either BLM or DOI, whichever is more appropriate, will conduct the supplemental search.

13. BLM's declaration indicates only that Mr. Montagna began working on the Streamlining Task Force on October 17, 2001 and does not indicate an ending date. *See* Cooney Decl. at ¶ 6. BLM's motion for summary judgment, however, indicates that "Montagna and Middleton . . . are housed at offices of the Department of Energy." *See* DOI and BLM Mot. 12.

cludes that DOI must search Mr. Montagna's records.

To argue, as the government does, that the Montagna records are unavailable to plaintiffs because the DOI employee who created them was working out of an office at DOE and because the records he created were maintained as a part of the record system of the CEQ is just too facile to withstand scrutiny. All parties, including the government, agree that Mr. Montagna *is* a DOI employee, and as previously noted, neither his physical location nor his agency's lack of physical possession of a record means that the record ceases to be an "agency record" under the agency's control and subject to the FOIA. *See Ryan v. Department of Justice,* 617 F.2d at 785. "A simple possession standard would permit agencies to insulate their activities from FOIA disclosure by farming out operations...." *Id.* Although the Montagna records may be physically located at DOE, they remain *Mr. Montanga's records,* and thus are the records of DOI. The Court agrees that DOI's failure to search the records of Mr. Montagna in connection with its response to plaintiffs' FOIA request constitutes an inadequate search.

### 2. Other Search Issues

#### a. Department of the Interior

DOI maintains that it has submitted declarations demonstrating that it has conducted a search reasonably calculated to uncover all relevant documents. *See* De-

fendant Department of the Interior and Defendant Bureau of Land Management's Motion for Summary Judgment ("DOI and BLM Mot.") at 19. In addition to the search issues regarding the records of Mr. Montagna, NRDC has identified four other areas in which it contends that DOI's search was inadequate: (1) Secretary's Norton's Records; (2) Specific Projects Considered by the Streamlining Task Force; (3) Missing Final Reports; and (4) Cut–Off Date for the April 18, 2002 request.[14]

#### i. Secretary Norton's Records

▮ NRDC claims that it has identified seven letters sent to Secretary Norton that DOI failed to discover in its search for records responsive to NRDC's request. *See* NRDC DOI and BLM Rep. at 4.[15] All but one of these letters was sent to Secretary Norton as a courtesy copy. *See* Buccino Decl., Ex. 33. As the government has explained, DOI maintains a correspondence system which "tracks all incoming and outgoing Secretarial correspondence." DOI and BLM Rep., Second Declaration of Sue Ellen Sloca ("Sec. Sloca Decl.") at ¶ 7. The government clarified at oral argument that this system was not set up for the purpose of responding to this FOIA request, but rather is the actual correspondence tracking system that has been used by DOI in the ordinary course at least since the beginning of the Bush Administration. In response to NRDC's allegation of inadequacy, DOI conducted a

14. NRDC acknowledges in its reply in support of its motion for summary judgment against DOI and BLM that in light of DOI's opposition to its motion, it is no longer seeking relief with respect to all of the search issues identified in its motion for summary judgment. *See* Plaintiff Natural Resources Defense Council's Reply in Support of Motion for Summary Judgment ("NRDC DOI and BLM Rep.") at 3. The Court therefore limits its consideration of the adequacy of search challenges to those areas identified in

NRDC's reply as having continuing vitality and, because it is unclear whether NRDC continues to challenge it, the cut-off date for the May 6, 2002 NRDC request. *See infra* at Section C(2)(a)(iv).

15. NRDC explains that it received these letters from the Department of Energy in response to a FOIA request identical to that submitted to DOI. *See* Buccino Decl. ¶ 60.

supplemental search of this correspondence system by both name and date, but was unable to locate copies of the letters in question. *See* Sec. Sloca Decl. at ¶ 7.

In view of these representations, the Court can only conclude that the failure to locate the letters in question simply indicates that they do not exist. The court of appeals has explained:

> The fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it. Thus, the Department is not required by the Act to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found.

*Miller v. U.S. Department of State,* 779 F.2d 1378, 1385 (8th Cir.1985); *see also Duenas Iturralde v. Comptroller of Currency,* 315 F.3d 311, 315 (D.C.Cir.2003). The Court concludes that DOI's failure to locate the letters in question does not render its search inadequate.[16]

### ii. Projects

■ NRDC maintains that DOI also has failed to conduct an adequate search for records responsive to NRDC's request for records related to "any project that was the subject of letter(s) or comment(s) submitted to the White House Task Force on Energy Project Streamlining." NRDC DOI and BLM Rep. at 7. Because DOI released summaries of the status of the projects considered by the Streamlining Task Force, NRDC argues, DOI clearly was aware of the identity of the projects and had a duty to construe NRDC's FOIA request broadly to encompass all documents relating to these projects. *See id.* at 9. DOI responds that it was entitled to rely on the exact text of NRDC's FOIA request in instructing its employees to search their records and that "[i]f NRDC was particularly interested in any given project without regard to any nexus to the Streamlining Task Force or implementation of the National Energy Plan—the defining characteristics of the May 6, 2002 request—NRDC should have specified as much in its request" and identified the particular projects by name. *See* DOI and BLM Rep. at 8–10. The Court agrees with DOI.

■ While an agency has a duty to construe FOIA requests liberally, *see Nation Magazine v. United States Customs Service,* 71 F.3d 885, 890 (D.C.Cir.1995), a requester has a duty to reasonably de-

---

**16.** None of the cases cited by NRDC in support of its contention that the search was inadequate bolsters its position because in those cases (in contrast to this one) the failure to locate records suggested that there was an additional database or location at the agency which should have been searched, but was not. *See Valencia–Lucena v. United States Coast Guard,* 180 F.3d at 327 (failure to search agency records stored at federal record center indicated that search was inadequate); *Campbell v. United States Department of Justice,* 164 F.3d at 27 (failure to search alternate index when documents located alluded to potentially responsive documents being contained in alternate index indicated that search was inadequate); *Oglesby v. United*

*States Department of the Army,* 920 F.2d at 68 (it was not clear from agency's affidavit that system searched was the only possible place that responsive records could be located).

NRDC raises for the first time in a footnote to its reply in support of its motion for summary judgment that it has not received records of telephone calls from DOI and that there was no indication in DOI's declaration that the Correspondence System in question tracked telephone calls. *See* NRDC DOI Rep. at 6 n. 3. It is not surprising that DOI's declarations fail to address the issue of telephone records when NRDC failed to raise the lack of such records until its reply. The Court will not consider this belated attack on the adequacy of the DOI search.

scribe the records sought. *See* 5 U.S.C. § 552(a)(3)(A)(i). A request "reasonably describes" the records sought where "the agency is able to determine precisely what records are being requested." *Tax Analysts v. Internal Revenue Service,* 117 F.3d 607, 610 (D.C.Cir.1997). NRDC requested records relating to projects that were the subject of comments to the Streamlining Task Force, and the exact language of NRDC's request was relayed to the individuals whose files were identified in the request. Sec. Sloca Decl. at ¶ 4. If NRDC intended DOI to specifically search its files for documents relating to specific projects about which comments were not directed toward the Streamlining Task Force, then NRDC had an affirmative burden to file an additional FOIA request detailing those projects. DOI searched its files in accordance with the language of the May 6, 2002 request, and no more was required.

### iii. Missing Final Reports

■ NRDC also claims that DOI has failed to release eighteen final reports relating to implementation of the National Energy Plan specifically identified by NRDC. NRDC maintains that the list was compiled from evidence in the released documents suggesting the existence of these reports. *See* NRDC DOI and BLM Rep. at 9. DOI agrees that the final reports would have been responsive to NRDC's May 6, 2002 request, but notes that "there is no indication that a final version of any of these documents was ever issued by the Department." DOI and BLM Rep. at 11; Sec. Sloca Decl. at ¶ 5. Even if the final reports exist, DOI argues, they did not exist in the files of the seventeen specific people that NRDC instructed DOI to search, and the search cannot be considered inadequate simply because it failed to produce final versions of the reports. *Id.* The Court agrees with DOI.

■ NRDC's argument that "it makes little sense that a draft of the document existed in the individuals' files, but the final copy does not" is purely speculative. NRDC DOI and BLM Rep. at 9. DOI provided a declaration attaching the FOIA request as it was distributed to the seventeen people in question and explained that each of the seventeen individuals submitted a certification that they had conducted the requested search. *See* Sec. Sloca Decl., Ex. A. As noted earlier, such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Services, Inc. v. SEC,* 926 F.2d at 1200 (internal citation and quotation omitted). The failure of an agency to turn up specific documents in its search "does not alone render a search inadequate. Rather, the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Duenas Iturralde v. Comptroller of the Currency,* 315 F.3d at 315 (citations omitted). DOI's failure to discover final versions of the reports does not call into question the adequacy of the search conducted by DOI.

### iv. Cut–Off Dates

■ NRDC claims that DOI's search was inadequate because it used a June 1, 2001 cut-off date for NRDC's April 18, 2002 request for correspondence relating to the NEPDG between outside parties and the 38 individuals identified by NRDC. *See* NRDC DOI and BLM Mot. at 18. DOI responds that the June 1, 2001 cut-off date was appropriate because no responsive documents were generated after the NEPDG finalized its recommendations. DOI and BLM Rep. at 5. The June 1, 2001 date was chosen "because the NEPDG

report was issued on May 17, 2001 and the work of the majority of the Department's work [sic] on the NEPDG was complete as of that date." DOI and BLM Mot., Declaration of Sue Ellen Sloca ("Sloca Decl.") at ¶ 23. DOI further indicated that DOI employees ceased generating documents relating to the National Energy Policy as of the publication of the policy on May 17, 2001. *See* DOI and BLM Rep., Declaration of Debra Agnolet ("Agnolet Decl.") at ¶ 14.

 NRDC did not specify a time frame in its April 18, 2002 request. *See* NRDC DOI Complaint, Ex. 2. The June 1, 2001 cut-off date was chosen solely by DOI. NRDC was not informed of the June 1, 2001 cut-off date until the submission of the declaration of Sue Ellen Sloca in conjunction with DOI's motion for summary judgment in this case. *See* NRDC DOI and BLM Rep. at 11. This prevented NRDC from making "supplementary demands for information" to augment the previous search. *McGehee v. Central Intelligence Agency*, 697 F.2d 1095, 1105 (D.C.Cir.1983). As the court of appeals noted in *McGehee*, the agency bears the burden of establishing that the cut-off dates imposed on any given search "comport with its obligation to conduct a reasonably thorough investigation," and it would be "extremely difficult" for an agency to convince the court that it may "reasonably" use any cut-off date "without so informing the requester." *Id.* at 1101,

1105; *see also Public Citizen v. Department of State*, 276 F.3d 634, 642–43 (D.C.Cir.2002) (unreasonable to impose date-of-request cut-offs on all FOIA requests). Because the DOI imposed the June 1, 2001 cut-off date without informing NRDC of its intention to do so, the Court must conclude that DOI's search was inadequate and that DOI must conduct a supplemental search using the date of the search as a cut-off date.[17]

 Finally, it is unclear to the Court whether NRDC continues to challenge the application of a cut-off date with respect to the search DOI conducted in response to NRDC's May 6, 2002 NRDC request. NRDC clearly says that, following DOI's reply, "there remain five separate areas where defendants have still not demonstrated that they conducted an adequate search." NRDC DOI and BLM Rep. at 3. The May 6, 2002 request, however, is not one of those five categories. *See id.* Yet, in a footnote to its discussion of the missing final reports NRDC states:

> DOI's claim that it did not use a cut-off date in responding to the May 6, 2002 Request, *see* Second Sloca Decl., ¶ 4, does not make sense, because DOI's attached instructions concerning this search only appear to ask for the *deliberative* materials that are the subject of the parties' fee waiver dispute. *See id.*, Att. A, at 3 (instructing officials to search for "recommendations, proposals,

**17.** NRDC attaches to its reply several DOI documents which it contends indicate "that the agency remained actively involved in the work of the NEPDG well after the Task Force issued its report on May 17, 2001." NRDC DOI and BLM Rep. at 11. These documents include a memorandum concerning an NEPDG Principals Meeting scheduled for July 13, 2001, that appears to involve the implementation of the national energy policy, as well as a calendar entry for that meeting and a subsequent meeting on December 20, 2001.

*See* NRDC DOI and BLM Rep, Ex. 2, 3, 4. Although these documents appear specifically to involve the implementation of the national energy policy, this does not mean that they and other documents prepared after the June 1, 2001 cut-off date selected by the DOI would not provide information concerning "who influenced the development of the [national energy] policy" as specified in NRDC's FOIA request. NRDC DOI and BLM Compl., Ex. 2.

suggestions, and other subjective matter that represent [ ] personal opinions."). Since DOI has provided no information concerning the scope of its search for the rest of the documents responsive to this request, the agency has simply not met its burden in this regard either. NRDC DOI and BLM Rep. at 10 n. 6.

The Court has no reason to doubt the accuracy of DOI's declaration that it did not use a cut-off date in responding to the May 6, 2002 request. *See* Sec. Sloca Decl. at ¶ 4. The Court is concerned, however, by the language included in the DOI tasking memorandum sent to the 17 individuals identified in the May 6, 2002 request because it limits the subject matter of the search. Although the memorandum directly incorporates the actual language from NRDC's FOIA request, it then goes on to explain the request, saying:

> Essentially, we need you to review your working level records specifically dealing with the White House Streamlining Task Force or implementation of the National Energy Plan. Such material would consist of comments, recommendations, proposals, suggestions, and other subjective matter that reflect the *personal opinions of the authors of these records.* The records containing this material *would not contain or represent formal or informal agency policies or decisions.* They would constitute the product of frank and open discussions among employees of the Department of the Interior.

Sec. Sloca Decl., Ex. A (emphasis added). Nothing in NRDC's FOIA request limited the scope to "opinion" documents. The request was intended to require a search

of the full files of the individuals identified. DOI is directed to conduct a supplemental search of the files of these individuals to encompass the full scope and precise language of the NRDC request.

### b. Department of Energy

■ NRDC maintains that its FOIA request to DOE specifically requested records related to contractors and that records released by DOE suggest that there were such contractors, but DOE has not produced the requested records. *See* NRDC DOE Mot. at 19. NRDC also claims that it has received a number of documents from other agencies that should also be in DOE's possession and control. *See* NRDC DOE Mot. at 19. The Court is satisfied that neither of these complaints casts doubt on the adequacy of the DOE search.[18]

■ "[A] search is not unreasonable simply because it fails to produce all relevant material...." *Meeropol v. Meese,* 790 F.2d at 952–53 (FBI's failure to produce all relevant records for a search dating back four decades did not render the search inadequate). The court of appeals has explained:

> The fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it. Thus, the Department is not required by the Act to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found.

---

**18.** NRDC also maintained that e-mails contained icons indicating attachments that were neither provided to NRDC or listed on DOE's *Vaughn* indexes. *See* NRDC DOE Mot. at 18. DOE adequately addresses this concern in its reply, which explains that the e-mail attachments in question have now been either released or listed on the *Vaughn* index. *See* Sec. Beard Decl. at ¶ 19.

*Miller v. Department of State,* 779 F.2d at 1385; *accord Duenas Iturralde v. Comptroller of the Currency,* 315 F.3d at 315.

■■ DOE explains that it first identified the offices that had been involved in the work of the NEPDG. *See* DOE and EPA Mot., Declaration of Abel Lopez ("A. Lopez Decl.") at ¶ 11. Representatives from these offices were instructed to search for "all records related to the work of the NEPDG and the National Energy Policy report." *Id.* at ¶ 12. During its release of documents, DOE became aware of missed documents and a department that had not been searched, and so it conducted further searches. *See id.* at ¶¶ 25–26. DOE also conducted a further search of offices that already had been searched. *See id.* at ¶ 27. An agency's disclosure of documents that it has previously withheld does not render its declarations suspect. *See Meeropol v. Meese,* 790 F.2d at 953; *Military Audit Project v. Casey,* 656 F.2d at 754. Were the Court to "punish flexibility" in this manner, it would imply that "a forthcoming agency is less to be trusted in its allegations than an unyielding agency." *Military Audit Project v. Casey,* 656 F.2d at 754. The Court is satisfied that DOE's declaration demonstrates that an adequate search was conducted.[19]

### D. *Exemption 4* [20]

Exemption 4 of the FOIA shields from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The exemption serves the interest of the government in operating efficiently and effectively by enabling it to obtain necessary commercial and financial information from private persons and business entities. It also protects the competitive interests of the suppliers of such information. *See Critical Mass Energy Project v. NRC,* 975 F.2d 871, 873 (D.C.Cir.1992); *National Parks and Conservation Ass'n v. Morton,* 498 F.2d 765, 768 (D.C.Cir.1974).

The Department of Commerce is withholding only six documents, two in their entirety and four in part, under FOIA Exemption 4. *See* Supplemental Motion for Summary Judgment by Department of Commerce, Supplemental Declaration of Roberta Ann Parsons ("Supp. Parsons Decl.") at ¶ 4. DOC states in its declaration that all of the documents withheld under Exemption 4 were voluntarily submitted to the government. *See* Supp. Parsons Decl. at ¶¶ 7, 10, 15. It came to light during oral argument that plaintiff Judicial Watch, in addition to challenging the propriety of the withholdings, also is challenging whether the documents in fact had been voluntarily submitted.

■■ The test for confidentiality under Exemption 4 differs depending on whether the information is voluntarily or involun-

---

**19.** This is with the exception of the records of the DOE employees detailed to the Office of the Vice President, as discussed above. *See* Section C(1) *supra.*

**20.** Judicial Watch initially challenged various agencies' withholdings under Exemptions 1, 2 and 6. Judicial Watch indicated in a January 30, 2004 notice to the court that it has elected not to continue to challenge the single document withheld by the Department of Commerce pursuant to Exemption 1. *See* Plaintiff Judicial Watch, Inc.'s Notice to the Court.

Judicial Watch has also indicated that it is no longer challenging the various withholdings under Exemptions 2 and 6. *See* Joint Report Concerning Oral Argument ("Joint Report") at 2 n. 2. NRDC is likewise not challenging withholdings under Exemptions 2 and 6. *See* NRDC Motion for Summary Judgment ("NRDC DOE Mot.") at 4 n. 2. All that remains for the Court to consider are the agencies' withholding of documents under FOIA Exemptions 4 and 5.

tarily submitted. "Exemption 4 protects any financial or commercial information provided to the Government on a voluntary basis if it is of a kind that the provider would not customarily release to the public." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d at 880. Even if the party previously has made voluntary, disclosures of the information, those disclosures do not constitute "customary disclosures" so long as they are not made to the general public. *Center for Auto Safety v. National Highway Traffic Safety Administration,* 244 F.3d 144, 148 (D.C.Cir.2001).

■ If commercial or financial information is provided on a mandatory basis, however, it is considered confidential "if disclosure of the information is likely . . . either . . . (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information is obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d at 873 (quoting *National Parks and Conservation Ass'n v. Morton,* 498 F.2d at 770). The distinction has been explained as follows:

> When the Government obtains information as part of a mandatory submission, the Government's access to the information normally is not seriously threatened by disclosure; the private interest is the principal factor tending against disclosure, and the harm to the private interest must be significant to prevent public access to information. However, when the Government receives information voluntarily, it has a strong interest in ensuring continued access, and therefore both the Government and private interests weigh against overly broad disclosure.

*Center for Auto Safety v. National Highway Traffic Safety Administration,* 244 F.3d at 148.

The Court concludes that all of the challenged documents were voluntarily submitted to DOC and that all were properly withheld for the reasons stated below.

### 1. Groppe, Long & Littell

■ Groppe, Long & Littell ("Groppe") informed DOC that the two documents it submitted "were not requested," and that they "provided these reports and have continued to send others . . . as a voluntary public service with the view that these independent studies might be useful." Supp. Parsons Decl. at ¶ 6. The government properly concluded that these documents were voluntarily submitted. Groppe further explained that its two documents were part of its work for its long-term retainer clients and are not customarily disclosed to the public. *See id.* at ¶ 6. Because the reports constitute work done for clients they are "commercial" in nature, and because Groppe has indicated that they are not customarily disclosed to the public, these documents were properly withheld pursuant to Exemption 4. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d at 880.

### 2. Nuevo Energy Company

■ Nuevo Energy Company ("Nuevo") indicated that its one document at issue was submitted "voluntarily" in order to resolve disputes with the government relating to Nuevo's "interests in federal offshore leases." Supp. Parsons Decl. at ¶ 8. Nuevo explained that the information it disclosed to the Department of Commerce was disclosed in anticipation of litigation and is not customarily disclosed to the public. *See* Supp. Parsons Decl. at ¶ 8. It further explained that the litigation is now currently pending and that the information contained in the document could be

used by Nuevo's competitors resulting in substantial competitive harm to Nuevo. *See id.* at ¶¶ 8–9. Because the document is commercial in nature and is not customarily disclosed to the public, it was properly withheld pursuant to Exemption 4. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d at 880.

### 3. Cambridge Energy Research Associates

 Cambridge Energy Research Associates ("CERA"), which submitted the remaining three documents, three versions of the same report, indicated that it "cannot say with certainly [sic] how the Department of Commerce came into possession of the report." Supp. Parsons Decl. at ¶ 14. CERA noted, however, that "no Federal Government official requested this study" and the "US Government was not a paid subscriber to the study." *Id.* CERA noted that it did send copies of the study to various government officials as a courtesy. *See id.*

As plaintiff Judicial Watch indicated during oral argument, the Department of Commerce cannot state specifically how the documents in question were obtained by the government. The Department of Commerce concluded from CERA's representations, however, that the studies were voluntarily provided by CERA. *See* Supp. Parsons Decl. at ¶ 15. Based on the Parsons declaration, the Court agrees with the DOC's conclusion and therefore analyzes the Exemption 4 withholding under the standard for "voluntarily" submitted information.

 The study was commissioned as a multiclient study in which the participants paid a minimum of $17,500 to participate. The report is sold for $2,500. *See* Supp. Parsons Decl. at ¶ 11. The study should therefore be categorized as "commercial" information. CERA indicated that the re-

ports are confidential and clients who receive a copy must sign a confidentiality agreement. *See id.* at ¶ 13. Because the documents are "commercial" in nature and are not customarily disclosed to the public, they were properly withheld pursuant to Exemption 4. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d at 880.

### E. Adequacy of Vaughn Indexes with Respect to Exemption 5

 In assessing a claimed exemption, a court will require the agency to provide a "relatively detailed justification" through the submission of an index of documents, known as a *Vaughn* Index, sufficiently detailed affidavits or declarations, or both. *Mead Data Central, Inc. v. United States Department of the Air Force*, 566 F.2d at 251; *see Oglesby v. United States Department of the Army*, 79 F.3d at 1178; *Vaughn v. Rosen*, 484 F.2d at 827–28. An adequate *Vaughn* index serves three functions: (1) it forces the government to analyze carefully any material withheld, (2) it enables the court to fulfill its duty of ruling on the applicability of the exemption, and (3) it gives the requester as much information as possible so that he can present his case to the court. *See Lykins v. U.S. Department of Justice*, 725 F.2d 1455, 1463 (D.C.Cir.1984). The Court may award summary judgment to a government agency solely on the basis of information provided in the *Vaughn* index or the affidavits or declarations submitted when the index, affidavits or declarations describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record or by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d at 738; *see*

also *Keys v. United States,* 830 F.2d 337, 349 (D.C.Cir.1987); *Vaughn v. Rosen,* 484 F.2d at 826–28. An agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements." *Goland v. CIA,* 607 F.2d at 352 (internal citation and quotation omitted).

All of the defendants have provided a combination of declarations and *Vaughn* indexes to justify their withholdings. Because of the volume of documents involved, each agency has used a system of categories to more fully explain the bases of their withholdings. Plaintiffs challenge this use of categories, noting that "general descriptions" are insufficient to justify withholdings under the FOIA and that, with respect to Exemption 5, the categorizations offered by the agencies do nothing to explain "how each particular document is both deliberative and pre-decisional." NRDC DOI and BLM Mot. at 38.

 As the court of appeals has explained, "it is the function, not the form, of the index that is important." *Keys v. United States Department of Justice,* 830 F.2d at 349. It is not necessary to provide an individual justification for each document, when doing so would either require "phony individualization" of documents for which the same explanation applies or would require the agency to explain in such detail that the *Vaughn* index itself would reveal the information that the agency is attempting to withhold. *Id.; see Judicial Watch, Inc. v. Export–Import Bank,* 108 F.Supp.2d 19, 34 (D.D.C.2000) (finding that a categorical indexing technique satisfied the requirements for a *Vaughn* index); *cf. Washington Post v. United States Department of Defense,* 766 F.Supp. 1, 15 (D.D.C.1991) (declarations provided by agency were insufficient to

adequately explain withholdings and agency was directed to produce detailed *Vaughn* index for a sample of files). It therefore often may be sufficient for an agency to describe categories of documents that are exempt and then apply those categories to the documents withheld.

Plaintiffs allege many instances in which they maintain that the *Vaughn* indexes provided by the government are inadequate. Because these inadequacies are demonstrable in connection with the agencies' Exemption 5 withholdings only, however, it is more appropriate simply to address the asserted inadequacies of the *Vaughn* indexes in conjunction with the discussion of the Exemption 5 withholdings themselves. To the extent that the Court can discern and resolve the Exemption 5 withholding issues from the declarations and indexes submitted, there can be no material deficiencies in the *Vaughn* indexes.

### F. Exemption 5

 Exemption 5 excludes from disclosure any documents that are "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This provision protects from disclosure those documents traditionally afforded protection "pursuant to evidentiary privileges in the civil discovery context," including those covered by the attorney-client and deliberative process privileges. *Dow Jones & Co. v. Department of Justice,* 917 F.2d 571, 573 (D.C.Cir.1990) (quoting *Formaldehyde Inst. v. Department of Health and Human Serv.,* 889 F.2d 1118, 1121 (D.C.Cir.1989) (internal quotation marks omitted)). In keeping with the FOIA's goal of broad disclosure, Exemption 5 is construed narrowly, *Department of Interior v. Klamath Water Users Pro-*

*tective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (*"Klamath Water Users"*), and the burden is on the agency invoking Exemption 5 to "establish[ ] its right to withhold evidence from the public .... [C]onclusory assertions of privilege will not suffice to carry" the agency's burden. *Senate of the Commonwealth of Puerto Rico v. United States Department of Justice,* 823 F.2d 574, 585 (D.C.Cir.1987) (quoting *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 861 (D.C.Cir.1980)).

### 1. Attorney–Client Privilege

■ Three of the agencies—USDA, EPA and DOC—have withheld documents under the attorney-client privilege. Judicial Watch's opposition challenges only the withholdings by USDA. *See* J.W. OMB, USDA and DOI Opp. at 13.[21] Judicial Watch argues that USDA withheld a portion of a document under the attorney-client privilege without explaining who the clients are or whether the withheld portions are limited to facts communicated by the clients. *See id.* USDA explains that the e-mail between the Chief Economist and the Office of the General Counsel "contains legal advice on how to address industry inquiries regarding [electrical sales by farmers] and substantive deliberative comments about the issue." OMB, DOI and USDA Mot., Declaration of Keith Collins ("Collins Decl.") at ¶ 64. The Court is satisfied that this document was properly withheld under Exemption 5.

### 2. Deliberative Process Privilege

■ The purpose of the deliberative process privilege is to encourage the frank discussion of policy issues among government officials and to protect the government's decision-making processes. *See Wolfe v. Department of Health & Human Serv.,* 839 F.2d 768, 773 (D.C.Cir.1988) (en banc) (citing S.Rep. No. 813, 89th Cong., 1st Sess. at 9 (1965), 1966 U.S.Code Cong. & Admin.News p. 2418). Such protection is necessary to

> assure that subordinates within an agency will feel free to provide the decision-maker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp. v. Department of Energy,* 617 F.2d at 866. *See also Klamath Water Users,* 532 U.S. at 8, 121 S.Ct. 1060 (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. at 151, 95 S.Ct. 1504) (government officials "will not communicate candidly among themselves if each remark is a potential item of discovery and front page news"; the object of the deliberative process privilege is "to enhance 'the quality of agency decisions.'"); *Wolfe v. Department of Health and Human Services,*

---

**21.** DOC explains that it is withholding a number of documents that contain client requests for legal advice regarding the proposed content of letters or the staff attorneys' responses to those inquiries. *See* DOT and DOC Mot., Declaration of Roberta Ann Parsons at ¶ 25. EPA explains that it is withholding certain e-mail messages that contain "recommendations and analysis by an EPA attorney that were provided in confidence and in response to a request for legal advice." *See* DOE and EPA Mot., Declaration of Thomas J. Gibson at ¶ 24. Judicial Watch does not challenge either of these withholdings in its oppositions, and the Court is satisfied that these withholdings were proper. *See* J.W. DOT and DOC Opp.; J.W. DOE and EPA Opp.

839 F.2d at 773 ("[T]he quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl.").

■ In order to qualify for protection under the deliberative process privilege of Exemption 5, a document must satisfy two conditions: (1) it must be either interagency or intra-agency in nature, *and* (2) it must be both predecisional and part of the agency's deliberative or decision-making process. *See Klamath Water Users*, 532 U.S. at 8–9, 121 S.Ct. 1060; *Petroleum Information Corporation v. United States Department of Interior*, 976 F.2d 1429, 1434 (D.C.Cir.1992); *Dow Jones & Co. v. Department of Justice*, 917 F.2d at 574.

### a. Lack of Agency Decision

■ As a threshold matter, plaintiffs argue that the materials in question cannot be protected by the deliberative process privilege in view of the government's position that only the NEPDG was making the final decisions, not the agencies themselves. *See* NRDC DOI and BLM Mot. at 28–29. The Court is not persuaded by this line of reasoning. The applicability of the deliberative process privilege does not turn "on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 153 n. 18, 95 S.Ct. 1504. "Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommen-

dations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process." *Id.; see also Judicial Watch, Inc. v. United States Postal Service*, 297 F.Supp.2d 252, 258–59 (D.D.C.2004) (deliberative process privilege helps protect against "public confusion through the disclosure of documents suggesting reasons for policy decisions that were ultimately not taken" by the agency). Simply because the final report of the national energy policy was issued by the NEPDG rather than by the defendant departments or agencies does not mean that the agencies themselves were not engaged in a deliberative process in developing recommendations that ultimately contributed to the formulation of that policy. The Court rejects plaintiffs' argument that Exemption 5 is wholly inapplicable in this case.[22]

### b. Communications with Non–Agencies

■ NRDC contends that the agencies and departments who are defendants in this case improperly have withheld documents sent to or received from non-agencies. *See* NRDC DOI and BLM Mot. at 27; NRDC DOE Mot. at 23. More specifically, NRDC argues that the agencies have improperly withheld records that were either sent to or received from the NEPDG or the NEPDG Working Group as well as at least one document sent from a staff person in the Office of the Vice President to "NEPD Communicators." NRDC DOI and BLM Mot. at 27.[23] NRDC contends

---

**22.** NRDC also claims that DOE is improperly withholding documents it received from other agencies because DOE was not engaging in a decision-making process. *See* NRDC DOE Mot. at 37. Clearly "inter-agency" communications are protected when they are part of the deliberative process. *See* 5 U.S.C. § 552(b)(5). As the Court already has explained, there was a protected deliberative

process and therefore any inter-agency communications that were a part of this process are entitled to protection.

**23.** NRDC also contends that DOI has withheld documents that came from or were sent to non-governmental persons or entities. *See* NRDC DOI Mot. at 27–28. DOI explained in its reply that, of the thirteen documents that

that neither the NEPDG nor the Office of the Vice President is an "agency" and that the communications in question therefore must be disclosed. *See id.*[24] The government responds that because the NEPDG was operating in a governmentally-conferred capacity, the documents shared between the departments and agencies who are defendants in this case and the NEPDG were all a part of the deliberative process and should be protected under Exemption 5. *See* DOI and BLM Rep. at 14–15.[25]

■ The term "agency" is defined by the FOIA to mean "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(f)(1). The legislative history makes clear, however, that the term "agency" does not include "the President's immediate personal staff or units in the Executive Office [of the President] whose sole function is to advise and assist the President." *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. at 156, 100 S.Ct. 960 (quoting H.R. Conf.

Rep. No. 93–1380, 93 Cong., 2d Sess. at 15 (1974)) Whether an entity within the Executive Office of the President is an "agency" under the FOIA is determined by analyzing whether, in addition to advising and assisting the President, the entity also has "substantial independent authority." *Meyer v. Bush*, 981 F.2d 1288, 1292 (D.C.Cir.1993). NEPDG would be considered an agency for FOIA purposes if "it could act directly and independently beyond advising and assisting the President." *Id.; see also Pacific Legal Foundation v. Council on Environmental Quality*, 636 F.2d 1259, 1263 (D.C.Cir.1980) (Council on Environmental Quality is FOIA agency because it has the power to coordinate federal programs and to issue guidelines to federal agencies and the authority to promulgate regulations); *cf. Rushforth v. Council of Economic Advisers*, 762 F.2d 1038, 1043 (D.C.Cir.1985) (Council of Economic Advisers is not FOIA agency because its purpose is to appraise federal programs and make recommendations to the President; it has no regulatory power).

Neither the U.S. Court of Appeals for this Circuit nor any judge of this Court has squarely addressed the issue of whether the NEPDG should be considered to be

---

NRDC characterized as wrongfully withheld for this reason, seven have been released to NRDC. *See* Sec. Sloca Decl. at ¶ 3. DOI explained to the Court's satisfaction that the remaining six documents were not released to non-agency personnel. *See id.* NRDC did not challenge the DOI explanation in its reply.

DOE also explains that several documents questioned by NRDC were, in fact, released to NRDC and that the remainder of the erroneously withheld documents were released on the date the reply was filed. *See* Sec. Beard Decl. at ¶¶ 12–15. NRDC did not challenge these explanations in its reply.

**24.** Plaintiffs also make the argument that all final agency decisions must be released. "[E]ven if a document is predecisional at the time it is prepared, it can lose that status if it

is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealing with the public." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d at 866. The Court acknowledges the validity of this proposition, but, as discussed below, it has already determined that any records containing advice given to NEPDG by agencies or agency personnel must be released because those records are no longer a part of the agency's deliberative process. Such documents would also include all "final agency decisions" in this context.

**25.** Although this discussion is cited in connection with the DOI briefing, the same arguments were advanced by the other departments and agencies as well.

an agency for purposes of the FOIA, although the assumption is that it is not. *See In re Cheney*, 334 F.3d 1096, 1116 n. 2 (D.C.Cir.2003) (Randolph, J., dissenting) ("None of the material sought in discovery here would be available through the Freedom of Information Act (FOIA)."); *Judicial Watch, Inc. v. National Energy Policy Development Group*, 233 F.Supp.2d 16, 18–20 nn. 1 & 2 (D.D.C.2002) (for ease of reference, characterizing the individual defendants and the NEPDG as the "non-agency defendants" to distinguish them from the federal agency defendants); *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F.Supp.2d at 55 ("[T]here is no reason for this Court to address whether the NEPDG is an "agency" for purposes of FOIA.").[26] Plaintiffs and defendants agree that the NEPDG is not an agency. *See* DOE Rep. at 3; NRDC DOI Mot. at 27; DOI and BLM Rep. at 14. The Court concludes that NEPDG is not an "agency" for purposes of the FOIA.

Although NEPDG is not an agency, the deliberative process of Exemption 5 is not necessarily inapplicable. As the Supreme Court has noted:

> It is textually possible and . . . in accord with the purpose of the provision, to regard as an intra-agency memorandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency—e.g., in a capacity as employee or consultant to the agency, or as employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency.

*Klamath Water Users*, 532 U.S. at 9–10, 121 S.Ct. 1060 (quoting *United States Department of Justice v. Julian*, 486 U.S. 1, 18 n. 1, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988) (5–3 decision) (Scalia, J., dissenting)). In *Klamath Water Users*, the argument was made that the outside party was advising the agency, the Department of the Interior, and it logically followed that an agency should not give up the protection of the deliberative process privilege (where it was applicable) merely because it solicited assistance and received advice from outside consultants during the course of its deliberations. *See Klamath Water Users* 532 U.S. at 10, 121 S.Ct. 1060; *see also Center for International Environmental Law v. Office of the United States Trade Representative*, 237 F.Supp.2d 17, 24–26 (D.D.C.2002).

This case is not like the hypothetical discussed in *Klamath Water Users*, however, because here the Department of the Interior (and other departments and agencies) are the ones giving the advice to a non-agency rather than receiving advice from "another governmental unit (not an agency)." *Klamath Water Users*, 532 U.S. at 10, 121 S.Ct. 1060. The government cites no law to support its position that any communication between an agency or an agency employee and a non-agency can be protected under Exemption 5 when it is the agency itself that is serving as the advisor. *See* DOI Rep. at 14–16. Both of the cases cited by the government which involve records being shared with third parties outside the government involved an agency soliciting assistance from the outside party, not vice versa. *See Klamath Water Users*, 532 U.S. at 13, 121 S.Ct. 1060 (Department of Interior solicited information from various Indian Tribes); *Public*

---

**26.** The Vice President and the Office of the Vice President are not agencies under the FOIA. *See* note 8 *supra*.

*Citizen, Inc. v. Department of Justice,* 111 F.3d 168, 169 (D.C.Cir.1997) (National Archives and Records Administration consulted with former Presidents regarding access to their presidential records). In the only case the government cites that involves giving advice to a non-agency, *Dow Jones,* the court concluded that the records in question were *not* protected by Exemption 5. *Dow Jones & Co. v. Department of Justice,* 917 F.2d at 575.

 The ultimate question is whether the documents in question were shared with or created for a non-agency, the NEPDG, by agency employees to aid in the deliberative process of the non-agency or the deliberative process of the agency. As the Supreme Court has said, the records may only be considered "intra-agency" or "inter-agency" if they were received by an agency "to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency." *Klamath Water Users,* 532 U.S. at 10, 121 S.Ct. 1060. By contrast, where the agency is responding to an outside request for information in connection with a non-agency's decision-making, such communications would be protected only if an agency decision can also be identified. *See Paisley v. CIA,* 712 F.2d at 698–99. Here, most of the records at issue were not received by an agency (the DOE or the DOI, etc.), but by a non-agency (the NEPDG), and they were not received or created to assist the agencies "in the performance of [their] own functions," *Klamath Water Users,* 532 U.S. at 10, 121 S.Ct. 1060, but to assist another governmental entity, the non-agency NEPDG, in the performance of its functions. *Cf. Paisley v. CIA,* 712 F.2d at 698–99 (expressing "reservations that a decision by *Congress* to initiate legislation can

be construed as an *agency* decision for FOIA purposes.") (emphasis in original).

Under both *Klamath Water Users* and the precedents of this Circuit, the law is clear. As Judge Silberman explained for the court of appeals:

[A]s long as the documents are created for the purpose of aiding *the agency's* deliberative process, ... they will be deemed intra-agency documents even when created by non-agency personnel.... Exemption 5 permits an agency to protect the confidentiality of communications from outside the agency so long as those communications are part and parcel of *the agency's* deliberative process. As such, they remain intra-agency documents. None of our cases have extended that notion, however, to the protection of deliberations of a *non-agency* either as an interpretation of "intra-agency" or "inter-agency."

*Dow Jones & Co. v. Department of Justice,* 917 F.2d at 575 (emphasis in original) (citing and relying upon *Formaldehyde Institute v. Department of Health and Human Services,* 889 F.2d at 1122, and *Ryan v. Department of Justice,* 617 F.2d at 790); *see also Rockwell International Corp. v. United States Department of Justice,* 235 F.3d 598, 604 (D.C.Cir.2001); *Paisley v. CIA,* 712 F.2d at 698.

Were the documents in question in this case created "for the purpose" of aiding the agencies' own deliberative processes or were they created to aid the deliberative processes of the NEPDG? If the former, they enjoy Exemption 5 protections and may properly be withheld; if the latter, they are not exempt and must be disclosed. *See Dow Jones & Co. v. Department of Justice,* 917 F.2d at 575. While it appears that the vast majority of the records were created by agency personnel to assist and advise a non-agency—and therefore are not exempt from FOIA disclosure

under Exemption 5—the declarations and *Vaughn* indexes supplied by the defendants unfortunately are largely deficient, and thus do not permit the Court to assess the merits of the claimed exemption, because they fail to acknowledge the distinction required by *Klamath Water Users* and *Dow Jones.* Unless a defendant agency—whose burden it is—can demonstrate how any given communication contributed to the *agency's* own deliberative process, the records must be released to plaintiffs. *See Paisley v. CIA,* 712 F.2d at 698 ("To ascertain whether the documents at issue are pre-decisional, the court must first be able to pinpoint an agency decision or policy to which these documents contributed."); *Judicial Watch, Inc. v. United States Postal Service,* 297 F.Supp.2d at 259 ("[A]n agency must also either pinpoint an agency decision or policy to which the documents contributed, or identify [an agency] decision-making process to which a document contributed.") (quotations and citations omitted).

For example, various departments and agencies conducted research and formulated recommendations and then submitted suggestions or recommendations to the NEPDG in the form of informal e-mails, policy memoranda, or draft chapters for the Final Energy Report. None of these suggestions are protected by Exemption 5 because they were not "part and parcel" of the deliberative process of the agency. At the time each draft chapter or policy suggestion was conveyed to the NEPDG, the agency's deliberations had ceased with respect to that suggestion or recommendation; the suggestion or recommendation itself was the final agency decision then being communicated to a non-agency. This does not mean that documents generated internally by the agencies during the process of formulating these various recommendations may not be protected by Exemption 5. They are protected under

the agency's deliberative process privilege if they represent only the *internal* deliberations of the agency. Similarly, if an agency deliberated about a given suggestion, but never submitted it to the NEPDG or the Working Group, the documents relating to those deliberations would remain protected under Exemption 5. Any records that represent recommendations or suggestions from an agency or department to the NEPDG or the Working Group, however, must be released.

With respect to communications from the NEPDG or the Working Group *to* the agencies, it is the agencies' burden to demonstrate which, if any, of these communications are both agency records and a part of the agency's deliberative process. For example, an agenda for a Working Group meeting would not seem to be a part of any agency's deliberative process. Similarly, instructions from the NEPDG to an agency would not seem to be a part of the agency's deliberative process. Communications from the NEPDG to the agencies must be released unless the agency can demonstrate how each communication is both deliberative and pre-decisional of an *agency's own* decision. *See Klamath Water Users,* 532 U.S. at 9–10, 121 S.Ct. 1060; *Dow Jones & Co. v. Department of Justice,* 917 F.2d at 575; *Paisley v. CIA,* 712 F.2d at 698; *Judicial Watch, Inc. v. United States Postal Service,* 297 F.Supp.2d at 259.

The records of the various individuals—particularly Andrew Lundquist and other DOE employees whose records have not yet been searched because these individuals were detailed to the Office of the Vice President—require a different analysis. Although they are agency employees, *see supra* at Section C(1), and thus their records are agency records, it is unclear how records generated by the NEPDG staff members, even if agency employees, would

be a part of the agency's own deliberative process. Mr. Montagna, who was serving as DOI representative to the Streamlining Task Force, presents a less difficult question because he was serving as a representative of an agency to an inter-agency task force, not detailed to a non-agency. In both instances, however, the agency must affirmatively demonstrate that each record is deliberative and pre-decisional of an agency decision, or they must be released to plaintiffs once they have been collected.

### c. Pre–Report Documents

#### i. Department of the Interior [27]

##### (a) April 26, 2001 Request

▮▮▮ In response to NRDC's April 26, 2001 FOIA request, DOI withheld documents in six categories. *See* DOI and BLM Mot., Declaration of William Bettenberg ("Bettenberg Decl.") at ¶¶ 20–38. The categories are: (1) all instructions/guidance issued by the Department [of the Interior] to the members of the various individual Interior Task Forces; (2) all briefing books used to brief the Secretary of the Interior; (3) latest versions of the individual Interior Task Force reports; (4) all documents based on the versions of the individual Interior Task Force reports that were used to brief the Secretary of the Interior; (5) all documents from the department to the NEPDG; and (6) all meeting notes that resulted from meetings of individual Interior Task Force members with non-Federal entities (or individuals). No responsive documents were found for categories 4 and 6. *See* Bettenberg Decl. at ¶ 31, 36.

Based on the descriptions of the documents contained within Categories 1, 2 and 3 in the Bettenberg declaration, the Court concludes that the documents in these categories were properly withheld under Exemption 5 because they relate to work done internally within the DOI to develop its recommendations for the NEPDG. The documents consist of internal suggestions by DOI employees to their supervisors and briefings prepared for the Secretary of the Interior. *See* Bettenberg Decl. at ¶¶ 20–30. Category 5, however, contains, among other documents, the "Department's consolidated submission" to the NEPDG. *See* Bettenberg Decl. at ¶ 34. This and similar documents are not protected under the deliberative process privilege because they consist of advice given by the agency *to the NEPDG* to aid in the deliberative process of the NEPDG. They appear to have nothing to do with the deliberative processes of DOI itself.

▮▮▮ DOI provided a supplemental release of documents on March 6, 2002. Of the four documents redacted under Exemption 5, all involve internal briefings except Document 3. *See* Bettenberg Decl., Ex. B. Document 3 was a communication between DOI and NEPDG. Depending upon whether the communication was from DOI to NEPDG or vice versa, and for what purpose it was sent, it may or may not be exempt from disclosure. But it is unclear from the description given whether it was properly withheld under Exemption 5. *See id.*

##### (b) April 18, 2002 Request

▮▮▮ Fourteen specific categories of documents were identified as describing the documents withheld or redacted in the DOI Privilege Log Index that was produced in conjunction with the April 18, 2002 FOIA request. The categories are: (1) e-mails among team members com-

---

**27.** No documents were withheld by BLM. *See* DOI and BLM Mot., Declaration of Larry Money at ¶ 12.

menting on draft reports or input to draft reports, but without draft reports attached; (2) e-mails among team members commenting on draft reports or portions of draft reports, with draft report, or portions of report, attached; (3) comments on or outlines of draft team reports, or portions of draft team reports, with nothing attached; (4) e-mails among team members with administrative details, comments and information; (5) e-mails among team members circulating draft reports or portions or reports, without comments; (6) e-mails among or to team members circulating substantive comments or information to be relied upon by team members; (8)[sic] Briefing for the Secretary; (9) e-mail with briefing paper, slides or talking points attached; (10) miscellaneous e-mails with administrative or background material that would reveal the substance of the Department's internal deliberations; (11) administrative or miscellaneous information; (12) draft team reports or portions of reports; (13) handwritten notes of team members; (14) comments provided by other agencies; and (15) comments to other agencies. *See* Bettenberg Decl. at ¶ 44.

With respect to most of these categories, DOI explains that the release of these documents "would reveal the process by which the Department developed the options it submitted to the NEPDG." *See* Bettenberg Decl. at ¶ 50. DOI's descriptions of the records encompassed by Categories 1, 2, 3, 4, 5, 6, 8, 10, 11, 12, 13, 14 and 15 all appear to indicate that the records in these categories were a part of DOI's internal deliberative process of formulating recommendations for the

NEPDG and did not encompass recommendations actually made to the NEPDG or the Working Group. *See id.* at ¶¶ 45–51, 53–58. This would be a protected deliberative process and the records related to that process properly could be withheld pursuant to Exemption 5. As the Court will discuss *infra* at F(2)(c)(i)(c), however, certain documents brought to the Court's attention by plaintiff shed doubt on the adequacy of DOI's descriptions of these categories.

Category 9 indicates that the materials included "support staff recommendations to the Secretary, *as well as ultimately to the NEPDG itself.*" *See* Bettenberg Decl. at ¶ 52. The description provided with respect to this category is facially insufficient for the Court to conclude that all of the documents contained within it were properly withheld under Exemption 5.

(c) Non–Exempt Withholdings

■ NRDC has identified a number of documents that it contends were wrongfully withheld by DOI because they were either sent to or received from the NEPDG. *See* Buccino Decl., Att. A.[28] The documents at issue are Documents 17 and 22–26 and Documents DOI064–0051–0052, DOI072–0116 and DOI072–0117–0118.[29] In creating its categories, DOI separated the documents withheld by document type—for example, draft chapters, etc. *See* Bettenberg Decl. at ¶¶ 20–38. Such categorizations are improper where they include both documents created internally for deliberative purposes within DOI and documents shared with the NEPDG.

28. Documents 18–20 were redacted solely on Exemption 6 grounds to remove birthdates and social security numbers. As plaintiffs are no longer challenging withholdings on Exemption 6 grounds, the documents were properly redacted. *See* DOI Mot., Declaration of William Bettenberg, Ex. A at 8–9.

29. NRDC incorrectly identifies the last three documents as being an attachment to the Cruickshank Declaration when they are, in fact, Attachment C to the Bettenberg Declaration.

▇▇ Documents 17 and 22–26 fall within Category 5 of the response to the April 26, 2001 request (communications from DOI to the NEPDG). The Court already has explained why this category is inadequate. Document 26, for example, is the "final draft version" of the report submitted by DOI to the NEPDG. *See* Bettenberg Decl., Ex. A at 11. It contains "the Department's recommendations and policy considerations regarding potential matters to include in the final report of the NEPDG." *Id.* As such, it constitutes a sharing of the final conclusions of the agency with a non-agency and cannot be protected as "agency deliberations" of the DOI *See supra* at Section F(2)(a)(ii). Such documents must be released to plaintiffs.

▇▇ The remaining three documents, Documents DOI064–0051–0052, DOI072–0116 and DOI072–0117–0118, are from the DOI's response to the April 18, 2002 request and fall into Categories 4 and 14 above. *See* Bettenberg Decl., Ex. C. The three documents were authored by DOE employees serving as staff to the NEPDG. From the descriptions provided in the Bettenberg declaration, however, both categories appear to contain only exempt records. Category 4, as described by DOI, appears to be purely internal DOI "team member" communications. Category 14 appears to be comments received by DOI *from other* "agencies." The presence of Documents DOI064–0051–0052, DOI072–0116 and DOI072–0117–0118 in these categories, however, casts doubt on DOI's definition of the terms "team members" and "agencies." Because these documents were authored by DOE employees serving as staff to the NEPDG, it is likely that DOI has included the NEPDG and the Working Group in its definitions of "team members" and "agencies." Classifying the records in these categories therefore is inadequate to justify the withholding of the

records contained within them pursuant to Exemption 5. The Court remains satisfied, however, that the records in Category 8, briefings for the Secretary of the Interior, were properly withheld.

DOI is directed to re-examine the documents contained within the following categories in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs: (a) with respect to its response to the April 26, 2001 request, the documents contained in Category 5; (b) with respect to its supplemental response of March 6, 2002, Document 3; and (c) with respect to its response to the April 18, 2002 request, the documents contained within Categories 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, and 15. For any records that DOI continues to withhold pursuant to Exemption 5, DOI must clearly explain in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court the contribution made by the withheld records to DOI's deliberative process.

### ii. Department of Energy

DOE explains that there were two independent activities being carried out by the DOE. First, different offices in the DOE were working to draft chapters for the final NEPDG report. *See* Beard Decl. at ¶ 9. Second, individuals at DOE were also providing suggestions for policy proposals to be included in the national energy policy. *See id.* at ¶ 10. After these policy proposals were approved, they were shared with the NEPDG. *See id.* As the Court already has explained, documents may be withheld under Exemption 5, even if shared with the NEPDG, if the DOE was still involved in its own deliberative process at the time and those communications were a part of the deliberative process of the DOE. Once DOE had formulated its policy proposals and shared those

proposals with the NEPDG or others, however, those final proposals cannot be withheld under Exemption 5.

 The Department of Energy's *Vaughn* index is extensive and NRDC has, quite reasonably, not identified specific documents that it believes were wrongfully withheld. Rather, it points out specific documents that it maintains are indicative of a pattern of wrongful withholding under Exemption 5. *See* NRDC DOE Mot. at 23.[30] DOE withheld more than 4500 documents responsive to the FOIA requests. *See* DOE *Vaughn* Index. Because of the volume of documents withheld, DOE breaks them down into eight categories when explaining the applicability of Exemption 5 to the withheld documents. *See* EPA and DOE Mot., Declaration of Susan Beard ("Beard Decl.") at ¶ 13. The Court need only deal with six of the eight categories: (1) drafts of the NEPDG Report and comments on drafts; (2) e-mail messages containing deliberative communications; (3) internal policy memoranda; (4) NEPDG agendas; (5) calendars and schedules of DOE officials; and (8) miscellaneous documents.[31]

 Category 1 consists of drafts of chapters for the NEPDG report. *See* Beard Decl. at ¶¶ 14–15. Category 2 consists of email messages containing comments on draft reports, suggestions, etc. *See id.* at ¶ 19.[32] Because the Court is unable to determine from DOE's declaration which records in these categories contain purely internal deliberative material and which constitute suggestions shared with the NEPDG or NEPDG documents, these category descriptions are inadequate.

Category 3 is described as internal policy memoranda. *See* Beard Decl. at ¶ 20. Four of the six sample documents (Documents 485, 443, 306, 121), however, are proposals that were presented to the NEPDG. *See id.* Agency recommendations to the NEPDG are not protected by Exemption 5. The final two sample documents, Documents 14 and 15, are a memorandum containing comments on a chapter and a redacted copy of that chapter and were communications to a Working Group member. *See id.* These records also appear to involve the *agency's* deliberative process. DOE indicates that some of the records in Category 3 contain issues that

---

30. In its opposition to DOE's motion for summary judgment, Judicial Watch incorporates NRDC's motion for summary judgment by reference and then goes on to offer a list of documents that it believes typify the inadequacies of DOE's *Vaughn* index. *See* J.W. DOE and EPA Opp. at 13–18. Judicial Watch's objections are incorporated in the above description of the applicability of Exemption 5 to DOE.

31. Categories 6 and 7 described documents withheld under Exemptions 2 and 6, which are no longer being challenged by plaintiffs.

32. NRDC has identified several documents contained in Category 2 that it contends DOE improperly withheld. *See* NRDC DOE Mot. at 37. DOE attempts to justify the withholdings by explaining that the individuals involved were associated with a DOE contrac-

tor providing technical support to the NEPDG. *See* Sec. Beard Decl. at ¶ 11. Although communications with outside contractors may be protected under Exemption 5, *see Klamath Water Users*, 532 U.S. at 11, 121 S.Ct. 1060; *Dow Jones & Co. v. Department of Justice*, 917 F.2d at 574–75; *Center for International Environmental Law v. Office of the United States Trade Representative*, 237 F.Supp.2d at 25, these documents were provided to a DOE contractor that "was tasked with technical support of the NEPDG under a contract issued by the Office of the Assistant Secretary for Energy Efficiency and Renewable Energy." Sec. Beard Decl. at ¶ 11. The contractors therefore were not working as a part of the DOE deliberative process and their communications are not exempt under the deliberative process privilege.

were submitted to the NEPDG and some do not. *See id.* Any documents that were submitted to the NEPDG as DOE proposals must be released to plaintiffs.

Category 4 consists of NEPDG agendas and are described as "internal NEPDG documents that were intended to instruct Working Group members and agency officials on the development of the energy policy." *See* Beard Decl. at ¶ 21. This category of documents seems formulated more to protect NEPDG deliberations than DOE deliberations. That is not the purpose of Exemption 5. These documents may be withheld only to the extent that they were used by DOE in its own deliberative process, which seems unlikely from the description provided.

■ Category 5 consists of calendars and schedules of DOE officials. *See* Beard Decl. at ¶ 22. Only one calendar had a redaction pursuant to Exemption 5.[33] The declaration explained that the Exemption 5 document had been redacted because it contained pre-decisional and deliberative information that was unrelated to the NEPDG. The *Vaughn* index entry for the document stated that "information redacted is deliberative and pre-decisional information related to other DOE matters." DOE *Vaughn* Index, No. 4415. DOE's assertion that the deliberative material is unrelated to the NEPDG satisfies the Court, and the document in this category was properly redacted.

Category 8, labeled "miscellaneous documents," consists of two separate groups of documents. The first is external documents that were annotated by Executive Branch employees. *See* Beard Decl. at ¶ 27. Both of the sample documents were annotated by DOE employees. *See id.* It is unclear whether all of the annotations were made by DOE personnel. It seems that at least some of these documents properly are withheld as a part of the deliberative process of DOE. It is important to note, however, that the declaration also states that "[t]hese documents could also reveal advice or suggestions conveyed by DOE to the NEPDG." *See id.* As the Court already has explained, advice given to the NEPDG is not protected by the deliberative process privilege. This category therefore appears to contain both exempt and non-exempt material and therefore is inadequate.

■ The second group of documents contained within Category 8 consists of intergovernmental communications that were withheld in their entirety. *See* Beard Decl. at ¶ 28. To the extent that these documents consist of advice transmitted to DOE, these documents were properly withheld. On the other hand, if these documents were not a part of DOE's, or some other agency's, deliberative process, then they must be released to plaintiffs.

As in the case of DOI, because some of the categories created by DOE fail to separate out documents conveyed to and from the NEPDG and the Working Group, they are insufficiently vague. DOE has applied an incorrect standard for Exemption 5 by conflating the deliberative process of the agency with that of the NEPDG.

DOE is directed to re-examine the documents contained within Categories 1, 2, 3, 4 and 8 in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs. For any records that DOE continues to withhold pursuant to Exemption 5, DOE must clearly explain in

---

**33.** The vast majority of the redactions were made pursuant to Exemption 6, which is no longer being challenged. *See id.*

a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court the contribution made by the withheld records to DOE's deliberative process.

### iii. Environmental Protection Agency

■ Judicial Watch challenges EPA's withholdings under Exemption 5 and the adequacy of its *Vaughn* index, noting that in many instances EPA has "provided a detailed description of the withheld documents," but listing a number of documents that it maintains are inadequately described to support their withholding under Exemption 5. *See* Plaintiff Judicial Watch, Inc.'s Opposition to the Motion for Summary Judgment by Defendants Environmental Protection Agency and Department of Energy ("J.W. EPA and DOE Opp.") at 8.

EPA organized the withheld documents into five categories based upon document type. *See* DOE and EPA Mot., Declaration of Betty A. Lopez ("B. Lopez Decl.") at ¶ 27. The categories were (1) drafts of NEPDG report; (2) e-mail messages between EPA staff and among the EPA, the White House and other federal agencies; (3) briefing papers and talking points on energy policy issues; (4) memoranda between NEPDG and Working Group participants; and (5) agendas for NEPDG meetings.[34] Although the descriptions of certain of the documents are lacking in detail, taken in combination with the declaration of Thomas Gibson, they would be sufficient to justify the withholdings if Exemption 5 had been applied properly. As with the departments and agencies previously discussed, however, EPA has applied an erroneous standard in conjunction with its Exemption 5 withholdings.

In Category 1, Mr. Gibson reports withholding drafts that "may contain EPA staff recommendations that may ultimately have been rejected by EPA management or the NEPDG and not included in the national energy policy report." *See* DOE and EPA Mot., Declaration of Thomas Gibson ("Gibson Decl") at ¶ 18. The deliberative process privilege does not protect recommendations from EPA to NEPDG. Categories 2 and 4 also fail adequately to describe the nature of the communication taking place between EPA and NEPDG. Category 3 documents may have been properly withheld, but the declaration is inadequate for the Court to reach a firm conclusion because it fails to state whether the briefing papers and talking points were purely internal deliberations of the EPA. The Category 5 documents do not appear to be related to the EPA deliberative process at all. Although EPA properly has withheld many documents reflecting solely internal deliberations, it is not possible from the current declarations to determine which documents these are.

EPA is directed to re-examine the documents contained within all of its categories in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs. For any records that EPA continues to withhold pursuant to Exemption 5, EPA must clearly explain in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court the contribution made by the withheld records to EPA's deliberative process.

### iv. Department of Agriculture

■ Plaintiff Judicial Watch maintains that USDA has "provided only general and conclusory descriptions of the withheld documents" and has not met its burden to

---

**34.** Documents also were withheld pursuant to Exemption 6, but these withholdings are not discussed because they no longer are being challenged by Judicial Watch.

justify its withholdings under Exemption 5. *See* Plaintiff Judicial Watch's Opposition to the Motion for Summary Judgment by Defendants Office of Management and Budget, U.S. Department of the Interior, and U.S. Department of Agriculture ("J.W. OMB, DOI, and USDA Opp.") at 11.

██ USDA provided a *Vaughn* index and supplemented it with a declaration explaining that the documents withheld could be separated into ten categories. *See* Collins Decl. at ¶ 27. The categories are (1) internal Working Group drafts of national energy policy report chapters; (2) internal Working Group comments on draft chapters; (3) internal Working Group recommendations and proposals regarding issues to be addressed in the report; (4) internal Working Group comments on those recommendations and proposals; (5) internal USDA comments, proposals and recommendations regarding energy policy issues; (6) briefing material for the Secretary of Agriculture; (7) internal Working Group instructions from the White House; (8) briefing information prepared by the Chief Economist and distributed to other Working Group agencies to present USDA energy concerns for consideration in the agencies' drafting of the NEPDG report; (9) USDA summaries of meetings held by the Working Group; and (10) miscellaneous Working Group communications. *See* Collins Decl. at ¶ 27. Like the other agencies, USDA refers to the documents included as, for example in Category 2, "another component of the NEPDG internal deliberative process." *See id.* at ¶ 33.

With respect to categories 1, 2, 3, 4, 7 and 10, USDA's categorizations are improper because they appear to include internal deliberations, advice communicated to the NEPDG and material that appears to be deliberative only with respect to the NEPDG. To the extent that these docu-

ments either communicated advice to the NEPDG or reflect the deliberative process of the NEPDG rather than that of the agency, they must be released. Category 5, however, "consists of internal USDA background material, comments, proposals, and recommendations regarding energy issues for consideration in developing USDA's position on energy issues to be addressed in the energy policy report." *See* Collins Decl. at ¶ 44. Likewise, Category 6 consists of briefing material for the Secretary of Agriculture. Documents contained in these categories properly were withheld under Exemption 5 because they reflect only the USDA's deliberations regarding proposals to ultimately make to the NEPDG. Category 8 consists of briefing information distributed to other Working Group agencies reflecting USDA opinions and concerns. *See* Collins Decl. at ¶ 54. USDA's description does not indicate that this information was part of the USDA deliberative process. It can only be withheld if USDA can explain how these documents were a part of its own or another agency's deliberative process. If they are a part of the deliberative process of only the NEPDG, they must be released. Category 9 includes summaries of Working Group meetings. *See* Collins Decl. at ¶ 58. Again, these documents can be withheld only to the extent that they are a part of USDA's deliberative process. Otherwise, they must be released.

USDA is directed to re-examine the documents contained within Categories 1, 2, 3, 4, 7, 8, 9 and 10 in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs. For any records that USDA continues to withhold pursuant to Exemption 5, USDA must clearly explain in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court

the contribution made by the withheld records to USDA's deliberative process.

### v. Department of Transportation

■ Plaintiff Judicial Watch notes that "Defendant DOT's *Vaughn* index has, in many instances, provided a detailed description of the withheld documents." *See* Plaintiff Judicial Watch, Inc.'s Opposition to Motion for Summary Judgment by Department of Transportation and Motion for Partial Summary Judgment by Department of Commerce ("J.W. DOT Opp.") at 8. Judicial Watch has identified specific *Vaughn* entries, however, which, it maintains, lack the specificity necessary for the Court to determine whether the documents were properly withheld. *See id.* at 8–13. Although these particular descriptions in the *Vaughn* index are lacking in detail, the *Vaughn* index in connection with the declaration of Linda Lawson together explain the categories of documents withheld. They would be sufficient to justify the agencies' withholdings if the agency had applied the proper standard for Exemption 5. Like the other agencies, however, DOT has misconstrued the scope of Exemption 5.

DOT explains that the documents withheld under Exemption 5 can be subdivided into four categories: "(1) drafts and comments on the National Energy Policy Report and supporting materials; (2) recommendations and proposals regarding issues to be addressed in the NEPDG Report; (3) inter-agency and intra-agency e-mails containing deliberative communications; and (4) agendas." *See* Motion for Summary Judgement by Department of Transportation and Motion for Partial Summary Judgment by Department of Commerce ("DOT Mot."), Declaration of Linda Lawson ("Lawson Decl.").

DOT refers to the documents included as, for example in Category 2, potentially revealing the deliberative process of the agency *and* the deliberative process of the NEPDG. *See* Lawson Decl. at ¶¶ 25, 27. Included is Document 310, for example, a memorandum from DOT to the White House, which does not appear to be a part of any deliberative process of DOT. *See id.* at 28. The same can be said for categories 1, 3 and 4. Like the other agencies, DOT has conflated the deliberative process of the agency with that of the NEPDG.

DOT is directed to re-examine the documents contained within all of its categories in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs. For any records that DOT continues to withhold pursuant to Exemption 5, DOT must clearly explain in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court the contribution made by the withheld records to DOT's deliberative process.

### vi. Department of Commerce

■ Judicial Watch also challenges the withholdings by DOC, stating that although DOC "has in some instances provided a detailed description of the withheld documents," in general it "has provided only general and conclusory descriptions" which do not justify the withholdings. J.W. DOT and DOC Opp. at 13. DOC explains that the documents that it has withheld pursuant to Exemption 5 fall into the following categories: (1) drafts of national energy policy report chapters and comments on the draft chapters; (2) recommendations, proposals and briefing materials relating to issues to be considered for the NEPDG report, and comments on these recommendations and proposals; (3) internal Working Group instructions and organizational material (including agendas and the like); (4) draft correspondence from the Secretary of Commerce to members of the public, and memoranda reflect-

ing recommendations concerning these letters; and (5) notes taken in preparation for or during meetings relating to the NEPDG. *See* Motion for Summary Judgment by Department of Transportation and Motion for Partial Summary Judgment by Department of Commerce ("DOT Mot."), Declaration of Kevin Murphy ("Murphy Decl.") at ¶ 20.

■ DOC indicates that Categories 1 and 2 include both internal agencies documents and documents shared with the Working Group. *See* Murphy Decl. at ¶¶ 21–29. It is unclear how Category 3, Working Group instructions and material, can be described as a part of the *agency's* deliberative process at all. *See id.* at ¶¶ 30–32. Category 5, meeting notes, is insufficiently described to permit the Court to determine whether the meetings in question were a part of the agency's deliberative process or that of the NEPDG. *See id.* at ¶¶ 36–40. Category 4, on the other hand, appears to contain solely internal DOC documents determining how to respond to public interest in the energy policy. Those documents therefore were properly withheld. *See id.* at ¶¶ 33–35.

DOC is directed to re-examine the documents contained within Categories 1, 2, 3, and 5 in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs. For any records that DOC continues to withhold pursuant to Exemption 5, DOC must clearly explain in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court the contribution made by the withheld records to DOC's deliberative process.

### vii. Documents Referred by Department of Commerce to other Agencies

DOC has filed a Second Supplemental Motion for Summary Judgment in conjunction with documents that it referred to other agencies. Many of the documents involved have either been addressed through the declarations and *Vaughn* indexes of other defendants in this case or have been released to plaintiffs. *See* Second Supplemental Motion for Summary Judgment by Department of Commerce ("Sec. Supp. DOC Mot."), Second Supplemental Declaration of Roberta Ann Parsons ("Sec. Supp. Parsons Decl.") at ¶ 6. The remainder are addressed by declarations submitted by various other agencies and are discussed below.

### (a) Non–Exempt Material

■ One document, withheld by the Council on Environmental Quality, consists of comments from the Senior Associate Director of CEQ to NEPDG on various papers used by NEPDG during the course of their deliberations. *See* Sec. Supp. DOC Mot., Ex. 6, Declaration of Phillip Cooney ("Cooney Decl.") at ¶ 5. Another document, withheld by the Federal Energy Regulatory Commission, is a letter to the NEPDG responding to a request for FERC's views and ideas on matters the Administration may want to consider as part of its National Energy Strategy. *See* Sec. Supp. DOC Mot., Ex. 7, Declaration of Susan J. Court ("Court Decl.") at ¶ 2. These two documents both appear to contain advice given to the NEPDG and therefore are not protected under Exemption 5. They must be released to Judicial Watch.

### (b) Insufficiently Described Materials

■ The remainder of the documents referred by the DOC to other agencies contain insufficient descriptions for the Court to determine whether they properly were withheld. The documents withheld by the Department of the Treasury consist of drafts of Chapter 5 of the NEPDG

Report and one document discussing the pros and cons of including tax recommendations in the NEPDG Report. *See* Sec. Supp. DOC Mot., Ex. 4, Declaration of Karen Hendershot ("Hendershot Decl.") at ¶ 10–11. The documents withheld by the U.S. Army Corps of Engineers were redacted to remove information pertaining to the work of the Hydropower Working Group, which was created to provide recommendations for the National Energy Plan. *See* Sec. Supp. DOC Mot., Ex. 3, Declaration of Linda J. Selinger ("Selinger Decl.") at ¶ 4. The documents withheld by the Department of State include two e-mails to the NEPDG and multiple drafts of Chapter 10 of the NEPDG report. *See* Sec. Supp. DOC Mot., Ex. 2, Declaration of Margaret P. Grafeld. The documents withheld by the Department of Commerce include e-mails between the DOC and Department of State and NEPDG. *See* Sec. Supp. Parsons Decl., Att. 2.

DOC is directed to re-examine these documents in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs. For any records that DOC continues to withhold pursuant to Exemption 5, DOC must clearly explain in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court the contribution made by the withheld records to DOC's or the authoring agency's deliberative process.

### d. Documents Dated after the NEPDG Report

NRDC also argues that it is improper to withhold documents on Exemption 5 grounds that were not created until after

the issuance of the NEPDG final report on May 17, 2001. *See* NRDC DOE Mot. at 27. These documents fall into two categories: documents that DOE has "reclassified" as non-responsive, and documents withheld by various agencies as part of the deliberative process of agency decisionmaking regarding the implementation of the recommendations in the NEPDG Final Report.[35]

#### i. Non–Responsive Documents

■ After the filing of NRDC's Motion for Summary Judgment, DOE reviewed the documents identified as created after the publication of the Report and reclassified a number of the post-Report documents as non-responsive to NRDC's FOIA request. No new *Vaughn* index was provided. DOE's explanation of the "reclassification" of these documents as non-responsive is inadequate. DOE gives a sample of five documents that were previously withheld under Exemption 5, but which now have been reclassified as non-responsive. *See* Sec. Beard Decl. at ¶ 17. Although the explanations provided for those samples are sufficient for the Court to conclude that four of the five sample documents actually are non-responsive documents, NRDC is correct that defendant's mere assertion that the remainder of the documents are "not responsive" is insufficient.[36]

For example, Document 2333 was released in part to plaintiffs. *See* DOE *Vaughn* Index, No. 2333. It was described as:

E-mail to Abe Haspel from David Letter, dated June 13, 2002, with one at-

---

**35.** DOE also identified a group of documents that were incorrectly dated through an auto-date feature on the computer programs. *See* Sec. Beard Decl. at ¶ 16. The Court is satisfied with DOE's declaration.

**36.** Example B in the Beard declaration, Bates # 17828, which explains that the document mentions the national energy policy only "in passing," does not persuade the Court that the document is non-responsive. *See* Sec. Beard Decl. at ¶ 18.

tachment not attached. Subject: Energy papers coming later tonight. B–5 Exemption—Information redacted consists of deliberative and pre-decisional material reflecting the process of commenting, recommending and revising draft documents relating to NEPDG

*Id.* DOE's declaration fails to explain why documents such as this have been reclassified as "non-responsive." The Court finds DOE's explanation patently insufficient and orders the release of any such documents that are not legitimately withheld under the Exemption 5 standards articulated in this Opinion. Any documents which DOE continues to withhold must be listed on a supplemental *Vaughn* index with sufficient detail to justify their withholding.

### ii. Implementation Documents

■ DOE and DOI have also withheld documents that they describe as being "predecisional" of decisions involving the implementation of the national energy policy. If the withheld documents can be accurately characterized as "deliberative" with respect to an identifiable future agency decision involving implementation, they are exempt under Exemption 5. If the post-Report documents are merely commentary on or explanation of the Report, however, they cannot be withheld as "deliberative." *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. at 152, 95 S.Ct. 1504.

Agencies other than DOE and DOI have also withheld documents dated after the release of the final public version of the Report, but these agencies have failed to identify any adequate justification for their withholding. The agencies' declarations contain no identification of "deliberations" other than those in connection with the agencies' formulations of recommendations for the NEPDG. That deliberative process clearly ended with the issuance of the

final Report and cannot justify the withholding of documents created after the final Report was issued. For example, USDA identified three documents in its *Vaughn* index, Documents 164, 205 and 206, that were created after the publication of the final Report. These documents consist of talking points regarding the release of the energy policy report and background information given to the White House. *See* USDA *Vaughn* Index. These descriptions identify no *agency* deliberation or decision and therefore the documents appear to be improperly withheld.

The agencies are directed to re-examine the post-Report documents contained within their *Vaughn* indexes in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs. To the extent that any agency continues to withhold post-Report documents, it must clearly explain in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court the contribution made by the withheld records to those agencies' deliberative processes.

#### (a) Department of Energy

■ DOE continues to withhold post-Report documents because they "they reflect DOE's pre-decisional deliberations regarding implementation of NEPDG proposals." *See* Sec. Beard Decl. at ¶ 18. This description is insufficient for the Court to determine that these documents were "deliberative" and "predecisional." Although DOE offers several "typical examples" of the documents in this category, *see id.,* it utterly fails even to attempt to categorize the remainder of the documents in a manner such as would allow the Court to determine of what decision they are "pre-decisional." These documents are not described more fully in DOE's *Vaughn* Index Errata. *See* NRDC DOE Rep., Att. 3. Although it is reasonable to point to the

NEPDG Report and explain that documents created prior to that Report were deliberative of the recommendations ultimately made by the departments or agencies to the NEPDG, to simply explain that all documents created after the Report are "pre-decisional" of "implementation" of the national energy policy fails to satisfy the government's burden of demonstrating the propriety of the withholdings.

It is possible that after the release of the NEPDG Report, there was further decision-making by the various agencies in determining how best to implement recommendations from the NEPDG. The Court is unable to find, however, that the post-Report, documents withheld by DOE satisfy the test for the deliberative process privilege because DOE has provided declarations which lack even a modicum of detail regarding what these "implementation" deliberations were.

DOE is directed to re-examine the post-Report documents contained within its *Vaughn* indexes in a manner consistent with the scope of Exemption 5 as explained in this Opinion and to release all non-exempt documents to plaintiffs. To the extent that DOE continues to withhold these documents, it must clearly explain in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court the contribution made by the withheld records to DOE's deliberative process.

### (b) Department of the Interior

■ Unlike the remainder of the agencies, DOI received a FOIA request specifically requesting "implementation" documents. *See* NRDC DOI Mot. at 7.[37] On May 6, 2002, NRDC submitted a FOIA request to DOI for, among other things,

documents and working level records for seventeen individuals relating to the Streamlining Task Force and the implementation of the Report recommendations. DOI explains that in order to implement the recommendations in the National Energy Policy, DOI established both cross-bureau teams and individual bureau teams to determine how best to implement the suggestions. *See* DOI and BLM Mot., Declaration of Walter Cruickshank ("Cruickshank Decl.") at ¶¶ 7–9. DOI discusses five categories of documents that describe the "working documents" withheld. *See* Cruickshank Decl. at ¶ 14. All of the categories clearly involve internal deliberations relating to the various teams and the briefing of senior officials. *See id.* These documents appear to have been properly withheld under Exemption 5. The Court also has reviewed the *Vaughn* index provided in conjunction with the redactions to the notes, minutes and records of meetings of the seventeen individuals. *See* Cruickshank Decl., Att. B. The Court has determined that DOI's explanation of its withholding of implementation documents satisfies Exemption 5.

### G. Segregability

■ Under the FOIA, if a record contains information that is exempt from disclosure, any reasonably segregable portion of the record must be released after deletion of the exempt portions, unless the agency can demonstrate that the non-exempt portions of a document are "inextricably intertwined with exempt portions." *See* 5 U.S.C. § 552(b); *Assassination Archives and Research Center v. CIA*, 334 F.3d at 57; *Trans–Pacific Policing Agreement v. United States Customs Service*, 177 F.3d at 1027–28; *Kimberlin v. Depart-*

---

37. BLM also received such a request, but withheld no documents. *See* DOI and BLM Mot., Declaration of Larry Money at ¶ 12.

*ment of Justice,* 139 F.3d at 949–50; *Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d at 260–61. This comports with the policy of disclosure and prevents the withholding of entire documents. *See Billington v. United States Department of Justice,* 233 F.3d at 586. To withhold the entirety of a document, the agency must demonstrate that it cannot segregate the exempt material from the non-exempt and must disclose as much as possible. *See Kimberlin v. Department of Justice,* 139 F.3d at 949–50; *Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d at 261.

NRDC contends that DOI and DOE have unlawfully withheld documents that are in whole or in part factual. *See* NRDC DOI and BLM Mot. at 32; NRDC DOE Mot. at 34. Because all but six of the documents withheld by the defendants were withheld pursuant to Exemption 5, and the Court has determined that all of the agency defendants have overextended the scope of the deliberative process privilege and must either release documents or provide a supplemental *Vaughn* index and/or supplemental declaration, it would be futile for the Court to rule on the adequacy of defendants' current efforts at segregation. The Court is confident that the agencies will release all non-exempt records and then provide *Vaughn* indexes or declarations that not only explain their continued withholdings under the strictures of this Opinion, but also explain their efforts at segregation.

## III. CONCLUSION

The primary focus of the dispute between the parties in this case is whether the agencies and departments of the government to whom the plaintiffs' FOIA requests were directed conducted searches of their files that were reasonably calculated to uncover all relevant documents and released all non-exempt, responsive documents to plaintiffs, thus furthering the purposes of the Freedom of Information Act to assist citizens in discovering "what their government is up to" and to "hold the governors accountable to the governed." Whether the agencies and departments fulfilled their obligations under the statute turns on the proper definition of "agency records" under the FOIA and the scope of the deliberative process privilege under Exemption 5 of the Act.

The Court has concluded that under relevant Supreme Court and D.C. Circuit precedent the agency and departmental employees who were detailed to the Office of the Vice President to work on the National Energy Policy Development Group remained agency employees and cannot be viewed as distinct from their departments or agencies. Thus, any documents they created or obtained while working as part of the NEPDG or its Working Group remained agency documents subject to disclosure under the FOIA. The Court also has determined, again based on applicable Supreme Court and D.C. Circuit precedent, that these agency employees had actual or constructive control of the documents and records they created and obtained regardless of the physical location of their work stations or the physical location of the documents.

The Court therefore has concluded that the records of the DOE employees detailed to the Office of the Vice President to work on the NEPDG or the Working Group were created or obtained by DOE and remained under the control of DOE, and thus were agency records for purposes of the FOIA. In addition, because at least one employee with the Department of the Interior was expressly acting as a DOI agency representative while serving on the Streamlining Task Force, his documents

and records also remain agency records for purposes of the FOIA. These documents therefore are subject to disclosure unless properly withheld under one of the nine enumerated exemptions.

The next major question the Court considered was whether records either originating in or communicated to the NEPDG could be withheld under Exemption 5 of the FOIA. To qualify for the protection of the deliberative process privilege under Exemption 5, a document must satisfy two conditions: (1) it must be either inter-agency or intra-agency in nature, and (2) it must be both pre-decisional and a part of the agency's deliberative or decision-making process. In view of the fact that neither the NEPDG nor the Office of the Vice President is an agency, the Court has concluded, under established Supreme Court and D.C. Circuit case law, that any documents obtained by the NEPDG from departments and agencies of the government or obtained or created by agency employees working at the NEPDG are not inter-agency or intra-agency documents. As the Supreme Court has said, records may only be considered intra-agency or inter-agency if they were received by an agency to assist it in the performance of its own decision-making process.

These documents cannot be considered deliberative or pre-decisional in nature when they were created or obtained not for the purpose of aiding the deliberative processes of a covered agency but in aid of the deliberative processes of a non-agency. Therefore, unless the defendant departments and agencies in this case can demonstrate how documents and communications sent to the NEPDG or created by agency employees for the NEPDG contributed to the agencies' own deliberative processes, the records must be released under the FOIA.

A separate Order consistent with this Opinion shall be issued this same day.

SO ORDERED.

## ORDER

For the reasons set forth in the separate Opinion issued this same day, it is hereby

ORDERED that defendant Office of Management and Budget's motion for summary judgment [24–1 in No. 01–0981] is DENIED as moot; it is

FURTHER ORDERED that defendant Department of the Treasury's motion for summary judgment [28–1 in No. 01–0981] is DENIED; Treasury is directed to grant Judicial Watch's request for a fee waiver and to begin processing Judicial Watch's FOIA request; it is

FURTHER ORDERED that defendant Federal Emergency Management Agency's motion for summary judgment [28–2 in No. 01–0981] is DENIED; FEMA is directed to grant Judicial Watch's request for a fee waiver and to begin processing Judicial Watch's FOIA request; it is

FURTHER ORDERED that defendant Department of the Interior and Defendant Bureau of Land Management's motion for summary judgment [16 in No. 02–1330] is GRANTED in part and DENIED in part; DOI is directed to grant NRDC's request for a fee waiver with respect to NRDC's May 6, 2002 FOIA request; it is

FURTHER ORDERED that defendant Department of Commerce's supplemental motion for summary judgment [78 in No. 01–0981] regarding its withholding of certain documents pursuant to Exemption 4 is GRANTED; it is

FURTHER ORDERED that plaintiff Natural Resources Defense Council's motion for summary judgment against DOI and BLM [20 in No. 02–1330] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that plaintiff Natural Resources Defense Council's motions for summary judgment against DOE [52 in No. 01–0981 and 34 in No. 01–2545] are GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendant United States Department of Agriculture's motion for summary judgment [24–2 in No. 01–0981] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendant Department of the Interior's motion for summary judgment [24–3 in No. 01–0981] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendant Environmental Protection Agency's motion for summary judgment [44–1 in No. 01–0981] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendant Department of Energy's motion for summary judgment [44–2 in No. 01–0981] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendant Department of Transportation's motion for summary judgment [56–1 in No. 01–0981] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendant Department of Commerce's motion for partial summary judgment [56–2 in No. 01–0981] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendant Department of Commerce's second supplemental motion for summary judgment [95 in No. 01–0981] is DENIED; it is

FURTHER ORDERED that DOE and DOI (or BLM) are directed to conduct the following searches:

i. DOE is directed to search the records of Andrew Lundquist and the other DOE employees detailed to the Office of the Vice President, to examine those documents in a manner consistent with the Opinion, and to release all non-exempt documents to plaintiffs on or before June 1, 2004;

ii. DOI and/or BLM are directed to search the records of Ronald Montagna, to examine those documents in a manner consistent with the Opinion, and to release all non-exempt documents to plaintiffs on or before June 1, 2004;

iii. DOI is directed to conduct a supplemental search in response to NRDC's April 18, 2002 request, using as a cut-off date the date of the search, and to release all non-exempt documents to plaintiffs on or before June 1, 2004;

iv. DOI is directed to conduct a supplemental search in response to NRDC's May 6, 2002 request using the exact language of NRDC's request, and using as a cut-off date the date of the search; DOI is directed not to limit the search to documents containing "the personal opinions of the authors" but rather to include *all* responsive documents; DOI shall release all non-exempt documents to plaintiffs on or before June 1, 2004; it is

FURTHER ORDERED that for any records that DOE and DOI and/or BLM withhold after these additional searches have been conducted, DOE and DOI and/or BLM must explain clearly in supplemental declarations and/or supplemental *Vaughn* indexes provided to plaintiffs and to the Court on or before June 1, 2004, the contribution made by the withheld records to that agency's own deliberative process or any other basis for withholding under a recognized FOIA exemption; it is

FURTHER ORDERED that the following departments and agencies are directed

to re-examine the following records currently withheld pursuant to Exemption 5 and to release all non-exempt documents to plaintiffs on or before June 1, 2004:

 i. DOI is directed to re-examine the documents contained within the following categories in a manner consistent with the scope of Exemption 5 as explained in the Opinion and to release all non-exempt documents to plaintiffs: (a) with respect to its response to the April 26, 2001 request, the documents contained in Category 5; (b) with respect to its supplemental response of March 6, 2002, Document 3; and (c) with respect to its response to the April 18, 2002 request, the documents contained within Categories 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, and 15;

 ii. DOE is directed to re-examine the documents contained within Categories 1, 2, 3, 4 and 8 in a manner consistent with the scope of Exemption 5 as explained in the Opinion and to release all non-exempt documents to plaintiffs;

 iii. USDA is directed to re-examine the documents contained within Categories 1, 2, 3, 4, 7, 8, 9 and 10 in a manner consistent with the scope of Exemption 5 as explained in the Opinion and to release all non-exempt documents to plaintiffs;

 iv. EPA is directed to re-examine the documents contained within all of its categories in a manner consistent with the scope of Exemption 5 as explained in the Opinion and to release all non-exempt documents to plaintiffs;

 v. DOT is directed to re-examine the documents contained within all of its categories in a manner consistent with the scope of Exemption 5 as explained in the Opinion and to release all non-exempt documents to plaintiffs;

 vi. DOC is directed to re-examine the documents contained within Categories 1, 2, 3, and 5 in a manner consistent with the scope of Exemption 5 as explained in the Opinion and to release all non-exempt documents to plaintiffs;

 vii. DOC is directed to re-examine the documents it referred to the Department of the Treasury, the U.S. Army Corps of Engineers, and the Department of State in a manner consistent with the scope of Exemption 5 as explained in the Opinion and to release all non-exempt documents to plaintiffs; it is

FURTHER ORDERED that to the extent that any agency continues to withhold documents pursuant to Exemption 5 after conducting the additional review, that agency is directed to explain clearly in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court on or before June 1, 2004, the contribution made by the withheld records to that agency's deliberative process; it is

FURTHER ORDERED that DOE, USDA, EPA, DOT, and DOC are directed to re-examine any and all documents listed in their *Vaughn* indexes dated after the public release of the National Energy Report in a manner consistent with the scope of Exemption 5 as explained in the Opinion and to release all non-exempt documents to plaintiffs on or before June 1, 2004; to the extent that DOE, USDA, EPA, DOT, or DOC continues to withhold documents dated after the release of the National Energy Report, that agency must explain clearly in a supplemental declaration and/or supplemental *Vaughn* index provided to plaintiffs and to the Court on or before June 1, 2004, the contribution made by the withheld records to that agency's deliberative processes; it is

FURTHER ORDERED that DOE is directed to re-examine the documents that it reclassified as "non-responsive" and release any responsive, non-exempt docu-

ments to plaintiffs on or before June 1, 2004; any documents that DOE continues to withhold must be explained clearly in a supplemental declaration and/or supplemental *Vaughn* index with sufficient detail to justify their withholding on or before June 1, 2004; and it is

FURTHER ORDERED that DOC is directed to release the document it referred to the Council on Environmental Quality and the document it referred to the Federal Energy Regulatory Commission on or before June 1, 2004.

SO ORDERED.